Filed 9/19/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re WILLIAM ILASA<br><br>on<br><br>Habeas Corpus. | D069629 |

ORIGINAL PROCEEDING in habeas corpus.  Petition denied.

William Ilasa, in pro. per.; Richard Pfeiffer, under appointment by the Court of Appeal, for Petitioner.

Kamala D. Harris, Attorney General, Phillip J. Lindsay, Assistant Attorney General, Rachael A. Campbell, Deputy Attorney General, for Respondent.

In this habeas corpus proceeding, we consider whether a decision of the Board of Prison Hearings (Board) that denies an inmate parole following a review procedure enacted pursuant to a federal court order is subject to state court judicial review and, if so, whether the Board violated the petitioner's due process rights in denying him early release in this case.  The federal court order at issue was issued by a three-judge court in prison class action litigation *after* the court found that California state prisoners' federal

constitutional rights had been violated as a result of overcrowding, *after* the court found that a prison release order was the only relief capable of remedying the constitutional deficiencies, *after* the United States Supreme Court affirmed those rulings, *after* the three-judge court issued its remedial order in reliance on the state defendants' representation and agreement that they would develop comprehensive and sustainable prison population-reduction reforms, and *after* the state defendants agreed not to contest the remedial order.

We issued an order to show cause in response to the petition of William Ilasa based on his allegations that he was denied due process of law when, at the conclusion of a prison-reduction procedure developed pursuant to the order of the three-judge court, the Board did not grant him parole as a non-violent, non-sex-registrant second-strike (NVSS) inmate. We conclude that, because the Board's decision involves a constitutionally protected liberty interest, Ilasa is entitled to judicial review of the decision. We further conclude that, because the record of what was presented to the Board during the review process contains some evidence to support the Board's decision, Ilasa's due process rights were not violated.

Accordingly, we will consider Ilasa's petition on its merits and deny it.

I.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *Ilasa's Commitment Offense and Sentence*

In February 2010, Ilasa was convicted of possession of a firearm by a felon (Pen. Code, former § 12021, subd. (a)(1);[1] subsequent unidentified statutory references are to this code) with a true finding as to a gang allegation (§ 186.22, subd. (b)(1)). This conviction was a second strike, and in May 2010 the superior court sentenced Ilasa to a determinate term of nine years — the upper term of three years on the felony, doubled due to the second strike, and three years on the enhancement.

B.      *Federal Court Litigation; February 2014 Order of the Three-judge Court*

On April 23, 1990, a group of plaintiffs filed a class action in the United States District Court for the Eastern District of California, entitled *Coleman v. Deukmejian*, No. 2:90-cv-00520-LKK (*Coleman*). On April 5, 2001, a group of plaintiffs filed a class action in the United States District Court for the Northern District of California, entitled *Plata v. Davis*, No. 3:01-cv-01351-TEH (*Plata*). The amended complaints in both class actions raised federal constitutional and statutory claims based on alleged inadequacies in

---

[1] The Legislature has since repealed Penal Code former section 12021 and replaced it with Penal Code section 29800. (Stats. 2010, ch. 711, § 10, operative Jan. 1, 2012.)

the delivery of mental health care (*Coleman*) and medical care (*Plata*) to inmates in the California adult prison system.[2]

In each of the class actions, the district court entered an order granting the plaintiffs' motion to convene a three-judge court to consider limiting the prison population by issuing a prisoner release order.[3] (*Coleman*, *supra* [2007 WL 2122636, *8]; *Plata*, *supra* [2007 WL 2122657, *6-*7].) Each district court recommended that the two cases be assigned to the same three-judge court. (See *Coleman v. Brown* (E.D. Cal. & N.D. Cal. 2013) 922 F.Supp.2d 1004, 1009.) The Chief Judge of the United States Court of Appeals for the Ninth Circuit agreed and in July 2007 convened a three-judge

[2] On our own motion, we have taken judicial notice of the records of the district courts in *Coleman*, *supra*, and in *Plata*, *supra*. (Evid. Code, §§ 459, subd. (a), 452, subd. (d)(2); *In re Taylor* (2001) 88 Cal.App.4th 1100, 1103, fn. 2.)

Each action named a number of individual and state agency defendants (together Defendants), including as the lead defendant the Governor of the State of California. In the text, *ante*, we provided the original case names and docket numbers in both *Coleman*, *supra*, and *Plata*, *supra*. Under federal court case management, the case names and docket numbers changed from time to time. Because the lead plaintiff in each case remained constant throughout, for consistency and ease of reading in this opinion, we will refer to the 1990 case as *Coleman* and the 2001 case as *Plata*.

[3] "Section 3626(a)(3)(C) of Title 18 of the United States Code authorizes a party to a civil action concerning prison conditions to file a request for a prisoner release order. As defined by the statute, a prisoner release order 'includes any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison.' 18 U.S.C. § 3626(g)(4). A prisoner release order may 'be entered only by a three-judge court in accordance with section 2284 of title 28,' if other statutory requirements have been met. 18 U.S.C. § 3626(a)(3)(B). A request for a prisoner release order must be accompanied by a request for a three-judge court and 'materials sufficient to demonstrate that' the statutory requirements for issuance of such an order have been met. 18 U.S.C. § 3626(a)(3)(C)." (*Coleman*, *supra* [2007 WL 2122636 at p. *1].)

4

district court pursuant to 28 United States Code section 2284. (922 F.Supp.2d at p. 1009.) From this point forward, all orders of the three-judge court were entered in both *Coleman* and *Plata*.

In August 2009, the three-judge court, having heard 14 days of testimony, issued a 122-page opinion. (*Coleman v. Schwarzenegger* (E.D. Cal. & N.D. Cal. 2009) 922 F.Supp.2d 882, 916.) The court found by clear and convincing evidence that overcrowding was the primary cause of the constitutional inadequacies in the delivery of mental (*Coleman*) and medical (*Plata*) care to California inmates and that no relief other than a "prisoner release order," as that term is defined in 18 United States Code section 3626(g)(4), was capable of remedying the constitutional deficiencies. (922 F.Supp.2d at pp. 949-951.) The three-judge court concluded by ordering Defendants to "reduce the prisoner population to 137.5% of the adult institutions' total design capacity" within two years. (*Id.* at p. 962; see *id.* at pp. 970, 1003.) The Governor appealed to the United States Supreme Court from this order. (See *Brown v. Plata* (2011) 563 U.S. 493.)

While the appeal was pending, Defendants proposed a specific plan to reduce the state's prisoner population. (*Coleman*, *supra* [see 2010 WL 99000, p. *1].) Other parties, including intervenors, objected, and the three-judge court extended the deadline by which Defendants were required to reduce the population of California's 33 adult prisons to no more than 137.5% of design capacity. (*Id.* at pp. *1-*3.) The three-judge court also set intermediate goals and deadlines and stayed the effective date of its order — and thus, the two-year deadline for complete compliance — pending the United States Supreme Court's disposition of the appeal from the August 2009 order. (*Id.* at p. *4.) The

5

Governor also appealed to the United States Supreme Court from this order, and the Supreme Court affirmed both orders in *Brown v. Plata*, *supra*, 563 U.S. at page 545.

After receiving the United States Supreme Court's ruling in *Brown v. Plata*, *supra*, 563 U.S. 493, in June 2011 the three-judge court filed an order setting specific dates for Defendants' interim and final compliance with the requirement to reduce the California prisoner population to no more than 137.5% of total design capacity. Those deadlines were later extended by an order of the three-judge court filed February 10, 2014 (February 2014 Order).[4]

Among various other rulings, in order to reach the required goals established in the February 2014 Order, the three-judge court ordered — and Defendants agreed — that Defendants would "*immediately implement*" a number of measures, including as relevant to the present proceeding, the creation of "*a new parole determination process through which non-violent second-strikers will be eligible for parole consideration by the Board . . . once they have served 50% of their sentence*." (Italics added.)

C.      *Defendants' Compliance with the February 2014 Order*

Pursuant to the above-quoted directive in the February 2014 Order, the California Department of Corrections and Rehabilitation (CDCR) created a process entitled "Non-Violent, Non-Sex-Registrant, Second-Strike (NVSS) Review," which was implemented on January 1, 2015. (<http://cdcr.ca.gov/boph/nvns_secstrkreview.html> [as of Sept. 16,

---

4       While not relevant to any issue in this proceeding, the February 2014 Order extended Defendants' deadline until February 28, 2016, for the reduction in the California prisoner population to no more than 137.5% of total design capacity.

2016] (the NVSS Procedures).)  As set out on the CDCR website, the NVSS Procedures set forth eligibility requirements and an administrative review process for those inmates determined to be eligible for review.  (NVSS Procedures, *supra*, Eligibility; *id.*, Hearing Officers and Procedure.)  The purpose of the administrative review is to determine — and, thus, the standard to be applied by the Board is — whether the inmate's release "would pose an unreasonable risk to public safety."  (*Id.*, Hearing Officers and Procedure.)

D.    *Ilasa's Review*

Inmates eligible for NVSS review include those whose terms were doubled under either section 667, subdivisions (b)-(i), or section 1170.12 and who have served 50 percent of their actual sentence.  (NVSS Procedures, *supra*, Eligibility.)

Applying the NVSS Procedures to Ilasa, the Board determined that it had jurisdiction, found that Ilasa was eligible for NVSS review, provided Ilasa with NVSS review, and denied release in a written ruling in August 2015.  The Board determined that, if released, Ilasa would "pose[] an unreasonable risk of violence on the community," based on the following general findings:  Ilasa's current commitment offense was an aggravating factor; Ilasa's prior criminal record was an aggravating factor; Ilasa's institutional behavior was a mitigating factor; and Ilasa had no medical condition that would impact his ability to reoffend.[5]  Ilasa timely requested reconsideration, and in

---

5    We set forth and discuss certain specific factual findings, to the extent necessary for our analysis, at part II.B., *post*.

7

September 2015, the Board affirmed the decision to deny release. Pursuant to the review criteria in California Code of Regulations, title 15, section 2042, the Board found that there was no mistake of law or fact in the denial of Ilasa's release.[6]

E.      *Ilasa's Petitions for Writ of Habeas Corpus*

Dissatisfied with the Board's decision to deny release, Ilasa filed a petition for writ of habeas corpus with the superior court, case Nos. HCN 1417 and SCN 233219. The court denied this petition in December 2015.

Representing himself, Ilasa initiated the present habeas corpus writ proceeding in this court by filing a petition in January 2016.[7] In April 2016, the Attorney General filed an informal response, and in May 2016 we issued an order to show cause why the

---

[6]      "The purpose of the decision review process is to assure complete, accurate, consistent and uniform decisions and the furtherance of public safety. Criteria for disapproval of a decision include a determination by the board that the panel made an error of law, or that the panel's decision was based on an error of fact, or that new information should be presented to the board, any of which when corrected or considered by the board, has a substantial likelihood of resulting in a substantially different decision upon a rehearing. In deciding if a decision should be approved, board staff shall review the information available to the panel that made the decision and any information received as provided in § 2028." (Cal. Code Regs., tit. 15, § 2042. Subsequent references to "Regulations" are to tit. 15 of Cal. Code Regs.)

[7]      The present writ proceeding is an original proceeding. (Cal. Const., art. VI, § 10 [courts of appeal have original jurisdiction in habeas corpus proceedings]; *In re Clark* (1993) 5 Cal.4th 750, 767, fn. 7 [no appeal lies from superior court's denial of petition for writ of habeas corpus; "a prisoner whose petition has been denied by the superior court can obtain review of his claims only by the filing of a new petition in the Court of Appeal"].) There is no issue in this appeal related to the superior court case.

requested relief should not be granted.[8]  Ilasa filed a supplement to the petition; the Attorney General filed a return; and Ilasa filed a traverse.

Ilasa argues that he was not afforded due process when the Board denied him parole pursuant to the NVSS Procedures.  More specifically, Ilasa contends that the record before the Board contains "no evidence" to support its conclusion that his release would pose an unreasonable risk to public safety.

In opposition, the People argue principally that, because the NVSS Procedures do not affect a liberty interest protected under the federal Constitution's due process clause, as a matter of law Ilasa is not entitled to judicial review of the Board's decision on early release.[9]  According to the Attorney General, the Board, through its commissioner responsible for reviewing the inmate's NVSS information, "has unfettered discretion to determine whether an inmate should be approved for release."  Alternatively, on the merits, the People contend that, because "some evidence" supports the Board's decision, Ilasa did not meet his burden of establishing entitlement to relief.

II.

DISCUSSION

The state may not deprive any person of life, liberty or property without due process of law.  (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, §§ 7, subd. (a), 15.)  A

---

[8]    We also appointed counsel for Ilasa.

[9]    We do not read Ilasa's petition or briefing as limiting his due process claim to one under the federal Constitution.

9

procedural due process challenge raises two questions: "the first asks whether there exists a liberty or property interest which has been interfered with by the State, [citation]; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient [citation]." (*Kentucky Dept. of Corrections v. Thompson* (1989) 490 U.S. 454, 460 (*Thompson*) [state procedures regarding inmates' visitation privileges].) "Protected liberty interests 'may arise from two sources — the Due Process Clause itself and the laws of the States.'" (*Ibid.*; see *id.* at p. 461 ["state law may create enforceable liberty interests in the prison setting"].)

Both of the questions posed in *Thompson* are at issue in this proceeding. In his petition, Ilasa contends his due process rights were violated in the Board's denial of parole following NVSS review; and in their return, the People challenge whether an inmate is entitled to judicial review of the Board's decision in denying parole following NVSS review. Before we reach the issue raised by Ilasa in his petition, we must first reach the issue raised by the People in their return.

As we explain, because the NVSS administrative review process affects a protectable liberty interest of the inmate, Ilasa is entitled to judicial review of the Board's decision denying him parole. As we further explain, in reviewing the Board's decision here, because there is some evidence to support the conclusion that Ilasa's release would pose an unreasonable risk to public safety, Ilasa did not meet his burden of establishing a due process violation.

10

A.      *Because the NVSS Administrative Process Creates a Protected Liberty Interest, Ilasa is Entitled to Judicial Review of the Board's Decision*

The People contend that the separation of powers doctrine precludes judicial review of the executive branch's decision to deny early release to Ilasa.  Their position is based on the premise that there is no statute or regulation either authorizing judicial review of the Board's decision or providing a liberty interest protected by the due process clause in the NVSS administrative process.  We decide the separation of powers issue de novo.  (*In re Lugo* (2008) 164 Cal.App.4th 1522, 1535-1536 (*Lugo*) [whether court order regarding Board's procedures violated separation of powers doctrine]; *State of Ohio v. Barron* (1997) 52 Cal.App.4th 62, 67 [whether state statute violated due process and equal protection].)

We disagree with the People's premise that the NVSS administrative process does not affect an inmate's liberty interest and, accordingly, conclude that an inmate like Ilasa is entitled to judicial review of the Board's decision.

1.      *Separation of Powers*

The separation of powers doctrine is found in our state Constitution at article III, section 3, which provides in full:  "The powers of state government are legislative, executive, and judicial.  Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."  The effect of this doctrine is to " 'limit[] the authority of one of the three branches of government to arrogate to itself the core functions of another branch.  [Citations.]' [Citation.]  . . . ' "Its mandate is 'to

11

protect any one branch against the overreaching of any other branch.' " ' " (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 662 (*Rosenkrantz*).)

" 'By its nature, the determination whether a prisoner should be released on parole is generally regarded as an executive branch decision. [Citations.] The decision, and the discretion implicit in it, are expressly committed to the executive branch.' " (*Lugo*, *supra*, 164 Cal.App.4th at p. 1537; see Cal. Const., art, V, § 8; Pen. Code, §§ 3040 et seq., 5075 et seq.) Thus, "[i]ntrusions by the judiciary into the executive branch's realm of parole matters may violate the separation of powers." (*Lugo*, at p. 1538 [trial court order requiring Board to state significant change in circumstances to justify its decision denying parole for more than one year following a prior one-year denial violated separation of powers]; see *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095, 1099 [trial court order allowing inmate to question Board commissioners regarding their parole-related decision process violated separation of powers].)

However, not all parole actions of executive branch are immune from review by the judicial branch. As our Supreme Court explained in *Rosencrantz*, *supra*, 29 Cal.4th 616, "the requirement of procedural due process embodied in the California Constitution (Cal. Const., art. I, § 7, subd. (a)) places some limitations upon the broad discretionary authority of the Board" — limitations subject to court review and enforcement by writ of habeas corpus. (*Rosencrantz*, at p. 655.) Thus, we next consider whether, and if so to what extent, the judiciary may — in the language of *Lugo*, *supra*, 164 Cal.App.4th at page 1538 — "[i]ntru[de] . . . into the executive branch's" parole review process.

2.     *Parole Following an Indeterminate Sentence*

"The parole consideration procedures are governed by section 3040 et seq. and apply to all inmates not serving a determinate sentence."  (*In re Jackson* (1985) 39 Cal.3d 464, 468.)  Thus, in the case of an *indeterminate sentence*, the Board's parole authority is governed by a body of statutes and regulations as mandated by the Legislature — most notably section 3041 and Regulations section 2402.  (*In re Prather* (2010) 50 Cal.4th 238, 249-250 (*Prather*) [Regs., § 2402 provides factors the Board is to consider in implementing the statutory mandate in § 3041].)

Under specified standards set forth in section 3041, subdivision (b), " 'the Board must grant parole unless it determines that public safety requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction.' "  (*In re Lawrence* (2008) 44 Cal.4th 1181, 1204 (*Lawrence*), italics deleted, quoting *Rosenkrantz*, *supra*, 29 Cal.4th at p. 654.)  As a result, indeterminately sentenced inmates have a "*due process liberty interest in parole*."  (*Lawrence*, at p. 1191, italics added; see *In re DeLuna* (2005) 126 Cal.App.4th 585, 591 [§ 3041, subd. (b) "creates a conditional liberty interest for a prospective parolee"].)  This liberty interest is based on " 'an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation.' "  (*Lawrence*, at p. 1204, quoting *Rosenkrantz*, at p. 654.)

As such — i.e., where a due process liberty interest in parole is at stake — the separation of powers doctrine does not preclude the judiciary's review of the executive's exercise of discretion.  (*Rosencrantz*, *supra*, 29 Cal.4th at p. 652 ["under California law

13

the factual basis for a Board decision granting or denying parole is subject to a limited judicial review"]; *Lawrence*, *supra*, 44 Cal.4th at p. 1191, 1212 [review of Board's finding whether the inmate poses a current threat to public safety].)  To the contrary, in reviewing parole suitability determinations, the scope of judicial review, while "limited," is nonetheless "meant to serve the interests of due process by guarding against arbitrary or capricious parole decisions, without overriding or controlling the exercise of executive discretion."  (*In re Shaputis* (2011) 53 Cal.4th 192, 199 (*Shaputis II*).)

  3. *Parole Following a Determinate Sentence Under NVSS Review*

  In the present case, unlike those discussed *ante*, where the inmate has been sentenced to *a determinate term*, there is no statute (like § 3041, subd. (b)) or regulation (like Regs., § 2402) that creates an inmate's expectation of parole.  Based on this distinction, the Attorney General argues that without such directive, an inmate like Ilasa can have no expectation of parole; that without such expectation, an inmate like Ilasa can have no protectable due process liberty interest in parole; and that without a due process liberty interest in parole, the separation of powers doctrine precludes judicial review of the Board's NVSS review.  The Attorney General's position is simply that the Board has "unfettered discretion" to determine whether an inmate (like Ilasa) who is eligible for NVSS review will be approved for release.   We disagree.

  The NVSS Procedures, although not a result of statute or regulation, were not created in a vacuum.  A three-judge federal court ruled that California state prisoners' federal constitutional rights had been violated as a result of prison overcrowding and that a prison release order was the only relief capable of remedying the constitutional

14

deficiencies. (*Coleman v. Schwarzenegger*, *supra*, 922 F.Supp.2d at pp. 949-951.) The United States Supreme Court affirmed those rulings. (*Brown v. Plata*, *supra*, 563 U.S. at p. 545.) The three-judge court issued its remedial February 2014 Order *in reliance on Defendants' representation and agreement* that Defendants would develop comprehensive and sustainable prison population-reduction reforms, and *Defendants agreed not to contest the February 2014 Order*. The NVSS Procedures were created and implemented pursuant to the February 2014 Order. (NVSS Procedures, *supra*, NVSS Overview.) Given the history behind the February 2014 Order and the enactment of the NVSS review process,[10] an inmate like Ilasa does have a protectable liberty interest — and thus a right to due process — in the NVSS review process.

      a.     *NVSS Procedures*

The NVSS review process resulted from one of the "narrowly tailored" remedies ordered by the three-judge court based on the constitutional violations identified by the *Coleman* and *Plata* courts that were affirmed by the United States Supreme Court in *Brown v. Plata*, *supra*, 563 U.S. 493.[11] More specifically, the California executive

_____

[10]    We do not accept the Attorney General's description of the process as just "an administrative process created in response to a federal court order" or "[o]ne reform measure authorized" by the February 2014 Order or a mere "discretionary power delegated to [the Board]." In issuing its February 2014 Order, the three-judge court relied on Defendants' representations and agreements that Defendants would create and implement comprehensive and sustainable prison population-reduction reforms and that Defendants would not contest the issuance or implementation of the order.

[11]    The three-judge court ruled that the various remedies ordered in the February 2014 Order were "narrowly tailored"; the parties in the *Coleman* and *Plata* class actions, including Defendants, agreed to the remedies ordered in the February 2014 Order; and no

branch Defendants expressed an affirmative intent to "enact[] programs . . . [and] develop[] . . . additional measures regarding reforms to state penal and sentencing laws designed to reduce the prison population," and with the agreement of the executive branch Defendants, the three-judge court ordered them to create and implement "*a new parole determination process through which non-violent second-strikers will be eligible for parole consideration by the Board of Parole Hearings once they have served 50% of their sentence*."  (Italics added; see NVSS Procedures, *supra*, NVSS Overview.)

As agreed to by Defendants and ordered by the three-judge court, the CDCR created and implemented the NVSS Procedures, which became effective January 1, 2015. (NVSS Procedures, *supra*, NVSS Overview.)  After an introduction that explains the three-judge court's February 2014 Order, which includes the italicized language set forth in the preceding paragraph, the NVSS Procedures set forth seven separately identified topics:  Eligibility; Input from Inmates, District Attorneys, Victims, and the Public; Access to Inmate Central Files; Risk Assessments; Hearing Officers and Procedure; Decision Review; and Release of Inmate.[12]  (NVSS Procedures, *supra*.)

---

party in the present case argues that the creation and implementation of the review process under the NVSS Procedures are not narrowly tailored.

[12]     The NVSS Procedures also contain online links to:  Weekly NVSS Results; Monthly NVSS Results; Annual NVSS Results; Board of Parole Hearings (with separate links to Board of Parole Hearings Overview, Executive Officer, Chief Counsel, Chairperson, Commissioners, Deputy Commissioners and Board Divisions); Executive Board Meetings; Proceedings; Legal Authorities; Statistical Data; Resources; Panel Attorneys; and MDO Independent Evaluators.  (NVSS Procedures, *supra*.)

In the section on "Eligibility," the NVSS Procedures first identify those who qualify for consideration of the required "new parole determination process" ordered by the three-judge court: "Inmates whose terms doubled pursuant to Penal Code section 667(b)-(i) or Penal Code section 1170.12 and who have served 50 percent of their actual sentence, or who are within 12 months of having served 50 percent of their actual sentence are eligible for review for possible release. Inmates are not eligible if they are required to register as sex offenders pursuant to Penal Code section 290 based on a current or prior conviction. Inmates are also not eligible if they have a current violent offense pursuant to Penal Code section 667.5(c). In addition, certain inmates will be ineligible based on specified negative institutional behavior." (NVSS Procedures, *supra*, Eligibility.) The NVSS Procedures then explain when an inmate will be screened for eligibility ("Inmates will be screened for eligibility at their annual unit classification committee review once they have served 50 percent of their actual sentence or are within 12 months of having served 50 percent of their actual sentence . . ."); what an inmate may do in preparation for the screening ("Inmates may request to review their central file prior to their annual classification committee review, consistent with existing policies and procedures for requesting review of central files."); when an inmate will be advised of a decision on eligibility ("At the conclusion of the unit classification committee [review]"); and what options an inmate will have if the inmate is referred to the Board for possible release (the inmate "may submit a written statement to the [B]oard"). (NVSS Procedures, *supra*, Eligibility.)

17

If an inmate is referred to the Board for possible release, the NVSS Procedures' section "Input from Inmates, District Attorneys, Victims, and the Public" allows for input from the inmate, as well as notice to and input from the district attorney of the inmate's county of commitment and any victims registered with the CDCR.

The section entitled "Access to Inmate Central Files" advises that inmates and district attorneys may access inmate files — in anticipation of both the initial annual classification committee review and the later referral to the Board for possible release — and sets forth the basic procedure for requesting file review.

Under the heading "Risk Assessments," the NVSS Procedures give notice that the Board will not prepare risk assessments for the NVSS inmates who are being considered for parole.

In a section entitled "Hearing Officers and Procedure," the NVSS Procedures explain what inmates can expect if, after a determination of eligibility, they are referred to the Board for possible release. Inmates are first advised of the timing of the review ("The review will occur within 50 days from the date the unit classification committee referred the inmate to the [B]oard, or if the inmate has not yet served 50 percent of his or her sentence, the [B]oard will conduct the review once the inmate is within 60 days of serving 50 percent of his or her sentence."). (NVSS Procedures, *supra*, Hearing Officers and Procedure.) This section also advises inmates what will be considered at the review ("The deputy commissioner will review all relevant and reliable information, including the inmate's criminal history, institutional behavior, rehabilitation efforts, and any written statements received."). (*Ibid.*) Most importantly, this section sets forth the standard to be

18

applied and by whom:  "*A deputy commissioner will conduct an administrative review to determine if the inmate's release would pose an unreasonable risk to public safety*."  (*Ibid*., italics added.)  Although there is no hearing, the Board is required to issue a written decision and provide copies to specifically identified people who participated in or are administratively involved in the review process.  (*Ibid*.)  Even after an inmate is referred to the Board for consideration for release, the Board will be notified of any disciplinary action taken against an inmate, and the classification committee may rescind a referral to the Board prior to an inmate's release if the inmate's case factors change.  (*Ibid*.)  Finally, a Board decision not to release an inmate will not affect the inmate's entitlement to a future review for referral to the Board for possible release at the inmate's next annual unit classification committee review.  (*Ibid*.)

The section entitled "Decision Review" provides information regarding further review of any decision of the Board concerning release of NVSS inmates.  This further review is conducted by an associate chief deputy commissioner, who is tasked with issuing a decision upholding or vacating the original decision and providing notification of the outcome.

The final section provides that an inmate who is approved by the Board will be released either "to state parole or post release community supervision as required by statute" within 50 days of the Board's decision.  (NVSS Procedures, *supra*, Release of Inmate.)

b. *Due Process Protection of Liberty Interest*

The People appropriately acknowledge that a due process right results when a state statute provides an expectation of parole, thereby creating a constitutionally protected liberty interest and a right to judicial review of the executive branch parole decision. (See *Lawrence*, *supra*, 44 Cal.4th at p. 1191, 1212 [§ 3041, subd. (b)]; *Rosencrantz*, *supra*, 29 Cal.4th at p. 652 [same]; see pt. II.A.2., *ante*.)  Similarly, statewide regulations for the administration of prisons may result in a protected liberty interest that requires due process in their application and subsequent judicial review.  (*In re Davis* (1979) 25 Cal.3d 384, 390 [Regs., § 3315, subd. (b)].)

The issue, therefore, is whether the NVSS Procedures (which are neither statutes nor regulations) also result in the type of expectation that creates a constitutionally protected liberty interest entitling an inmate to due process in — and, thus, potential court review of — their application.  We believe so; together, the February 2014 Order[13] and the NVSS Procedures provided Ilasa with a constitutionally protected liberty interest.

The Attorney General has not cited, and our independent research has not disclosed, authority to support her argument that *because the NVSS Procedures were not created as the result of a statute or a regulation*, the Board has "unfettered discretion" to

---

[13]    Our reliance on the February 2014 Order includes the events that preceded it:  the United States Supreme Court's affirmance of the three-judge court's orders finding a constitutional violation and entitlement to a prison release order; the three-judge court's reliance on Defendants' representation and agreement that Defendants would develop comprehensive and sustainable prison population-reduction reforms; and Defendants' agreement not to contest the February 2014 Order or its implementation.

determine whether an inmate will be approved for early release. To the contrary, "it is clear that prison regulations and policies can confer liberty interests"; "in assessing whether [the] state has created a liberty interest '*the appropriate constitutional analysis looks beyond the State's statutes* to administrative rules, regulations, contractual commitments, and the like.' "[14] (*Smith v. Sumner* (9th Cir. 1993) 994 F.2d 1401, 1405, italics added.)

The United States Supreme Court explained more than a quarter century ago that " 'a State creates a protected liberty interest by placing substantive limitations on official discretion.' [Citation.] A State may do this in a number of ways. . . . [T]he most common manner in which a State creates a liberty interest is by establishing 'substantive predicates' to govern official decision-making, [citation], and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." (*Thompson*, *supra*, 490 U.S. at p. 462.) In *Hewitt v. Helms* (1983) 459 U.S. 460, the Court explained that "the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest." (*Id.* at p. 472 [due process challenge to state's procedures regarding inmate's administrative segregation].) Significantly, although a routine judicial order issued by a federal court "would not seem to satisfy the requirement

---

14      We note both that the Attorney General describes the NVSS Procedures as "*administrative guidelines*" and that the Ninth Circuit expressly included "administrative rules" in its non-inclusive list of how liberty interests may be created (*Smith v. Sumner*, *supra*, 994 F.2d at p. 1405).

21

that liberty interests arise out of either the Due Process Clause or state law[, . . .] because a state necessarily enters into a consent decree voluntarily, . . . *any rules which a decree establishes are by any meaningful measure state-created.*"[15]  (*Smith v. Sumner*, *supra*, 994 F.2d at p. 1406, citation omitted, italics added.)  For these reasons, we cannot accept the Attorney General's position that there can be no protected liberty interest in the review process solely because the NVSS Procedures are not a product of state statutes or regulations that created a reasonable expectation of parole.

Applying these standards to the present case, we conclude that the NVSS Procedures at issue here — i.e., procedures put in place pursuant to the February 2014 Order — created reasonable expectations and, therefore, a protected liberty interest for second-strike inmates like Ilasa.  We are not persuaded by the Attorney General's argument that, unlike indeterminately sentenced inmates, determinately sentenced inmates like Ilasa could never have an expectation of parole because at the time they were sentenced there were no early release procedures in place.  The head of the executive branch (i.e., the Governor), along with other executive branch Defendants in the *Coleman* and *Plata* class actions agreed to the terms of the February 2014 Order, including specifically that the CDCR would "*immediately . . .* [¶] *. . .* [*c*]*reate and implement a new parole determination process through which non-violent second-*

---

15    Although the February 2014 Order does not contain the words "consent decree," it is based on and reflects Defendants' express representation that they would develop "a new parole determination process," which resulted in the NVSS Procedures, and the Attorney General has confirmed that "[D]efendants agreed" to create and implement this process.

*strikers will be eligible for parole consideration by the Board . . . once they have served 50% of their sentence*." (Italics added.) The CDCR accordingly created and implemented the NVSS Procedures, which provide in part: "Inmates *will be screened for eligibility* at their annual unit classification committee review once they have served 50 percent of their actual sentence or are within 12 months of having served 50 percent of their actual sentence . . ." (*id.*, Eligibility); if an inmate is eligible for this early release, then *within a specified time* "[t]he deputy commissioner *will review* all relevant and reliable information . . ." and "*will conduct an administrative review* to determine if the inmate's release would pose an unreasonable risk to public safety" (*id.*, Hearing Officers and Procedure); the deputy commissioner "*will document* his or her decision" in writing on a specified form and "*will*" notify all involved of the decision (*ibid.*); if the inmate submits a proper request, a further review "*will be conducted*" by an associate chief deputy commissioner, and the Board "*will . . . issue a decision* upholding or vacating the original decision" and "*will . . . notif*[*y*]" those affected by the decision (*id.*, Decision Review);[16] and, significantly, when an inmate is approved for release, the Board "*will . . . release*[ the inmate] to state parole or post release community supervision" within a specified time (*id.*, Release of Inmate). (Italics added.)

---

[16] We note that in reviewing and upholding the initial denial of parole in Ilasa's case, the Board applied the review criteria in Regulations section 2042, which contains the criteria for review of initial parole decisions for inmates serving *indeterminate* sentences. This suggests that the Board did not consider this portion of the NVSS procedure different from that applied in reviewing parole decisions of indeterminately sentenced inmates who unquestionably have a due process liberty interest in parole. (*Lawrence*, *supra*, 44 Cal.4th at p. 1191; see pt. II.A.2., *ante*.)

23

With a protected liberty interest and, thus, an entitlement to due process in the NVSS review, Ilasa is entitled to judicial review of the Board's decision.[17]

B.  *Because the Record Contains Some Evidence to Support the Board's Decision, Ilasa's Due Process Rights Were Not Violated*

Ilasa contends that he was not afforded due process of law when the Board denied him parole under the NVSS Procedures. In denying parole, consistent with the NVSS Procedures, the Board based its decision on the finding that Ilasa poses "an unreasonable risk of violence to the community." Ilasa's argument is that he was denied due process because the record contains "no evidence" that he would pose an unreasonable risk to public safety.

Although our research has not disclosed any authority that discusses the standard to be applied in reviewing the Board's decision to deny parole under the NVSS Procedures, we are not deciding this issue without some guidance. We have the benefit of years of judicial review of Board decisions denying parole to inmates sentenced to indeterminate terms.

In *Prather*, our Supreme Court summarized its conclusions in *Lawrence*, *supra*, 44 Cal.4th 1181, and *In re Shaputis* (2008) 44 Cal.4th 1241 (*Shaputis I*), as follows: "[T]he standard governing judicial review of parole decisions made either by the Board or by the Governor is whether 'some evidence' supports the determination that a prisoner remains

---

17    Because we decide that Ilasa is entitled to judicial review of the Board's decision based on a protected liberty interest — and, thus, an entitlement to due process — in the NVSS review process on the grounds stated in the text, *ante*, we have not considered and express no opinion as to any other arguments raised by Ilasa in the supplement to his petition or in his traverse.

currently dangerous."  (*Prather*, *supra*, 50 Cal.4th at p. 243.)  Indeed, courts apply the same "some evidence" standard in reviewing Board decisions rescinding parole.  (*In re Powell* (1988) 45 Cal.3d 894, 903-904.)  This is a standard that "does not usurp the executive's discretionary authority over parole matters or otherwise violate the separation of powers doctrine.  Rather, such review simply ensures that parole decisions are supported by a modicum of evidence and are not arbitrary and capricious."  (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 626; see *Shaputis II*, *supra*, 53 Cal.4th at p. 215 ["The 'some evidence' standard is intended to guard against arbitrary parole decisions, without encroaching on the broad authority granted to the Board and the Governor."]; *Lawrence*, *supra*, 44 Cal.4th at pp. 1204-1205.)

Our review of the Board's decision following a denial of parole under the NVSS Procedures presents the same issues and concerns as courts' review of Board decisions granting, denying or rescinding parole of inmates sentenced to indeterminate terms.  Accordingly, we will apply the same standard here and review the Board's decision denying parole to Ilasa for *some evidence*.[18]

In this context, "some evidence" means that, in support of its decision, the Board must be able to point to "factors beyond the minimum elements of the crime for which the inmate was committed."  (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1071 [review of Board's decision denying parole from indeterminate sentence].)  Such factors could include, for example and without limitation, details (beyond the minimum elements) of

---

[18]    The parties agree that we should apply the "some evidence" standard to review the Board's decision here.

25

the crime itself, prior crimes, or any other unsuitability factor such as the inmate's institutional behavior. We look at the evidence before the Board to determine whether the evidence supports the *conclusion* that the inmate poses an unreasonable risk of violence to the community, not merely whether some evidence supports a specific factual finding made in reaching the ultimate conclusion. (*Lawrence*, *supra*, 44 Cal.4th at p. 1191 [review of Governor's decision reversing Board's grant of parole from indeterminate sentence].) The relevant inquiry is whether the identified facts are probative of the ultimate issue whether the inmate poses a *current* unreasonable risk of violence to the community. (*Shaputis I*, *supra*, 44 Cal.4th at p. 1254 [review of Governor's decision reversing Board's grant of parole from indeterminate sentence].) The reviewing court does not decide whether the inmate currently poses an unreasonable risk of violence; that issue is left to the Board. (*Shaputis II*, *supra*, 53 Cal.4th at p. 221 [review of Board's decision denying parole from indeterminate sentence].) The reviewing court "is not empowered to reweigh the evidence," but only considers "whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness." (*Ibid.*)

We reject Ilasa's suggestion that, in our review of whether the record contains some evidence to support the Board's conclusion that Ilasa poses "an unreasonable risk to public safety" (NVSS Procedures, *supra*, Hearing Officers and Procedure), we apply Proposition 47's definition of "unreasonable risk of danger to public safety." The Proposition 47 definition is found in section 1170.18, subdivision (c), which provides in full: "As used throughout this Code, 'unreasonable risk of danger to public safety' means

26

an unreasonable risk that *the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667*." (Italics added.) First, by its terms the Proposition 47 definition applies only to the Penal Code (§ 1170.18, subd. (c)), and we are considering a review under the NVSS Procedures. Second, a successful petition under Proposition 47 results in a defendant's felony sentence being recalled and the defendant being resentenced to a misdemeanor pursuant to specified sections of the Penal Code (§ 1170.18, subd. (b)), whereas a successful petition for writ of habeas corpus results in "discharge . . . from . . . custody or restraint" (§ 1485). Third, there is no indication that the crime of which Ilasa was convicted (namely, felon in possession of a firearm (former § 12021, subd. (a)(1)) is included among those to which Proposition 47 applies (namely, §§ 459.5, 473, 476a, 490.2, 496, 666; Health & Saf. Code, §§ 11350, 11357, 11377). (§ 1170.18, subd. (a).) Fourth, in determining whether the inmate poses an unreasonable risk of danger to public safety, Proposition 47 requires the court to determine whether the inmate "will commit a new violent felony" (§ 1170.18, subd. (c)), whereas the NVSS Procedures contain no such standard. Finally, since Proposition 47 became effective in November 2014 (*People v. Johnson* (2016) 1 Cal.App.5th 953, 957; *People v. Rivera* (2015) 233 Cal.App.4th 1085, 1089) and the NVSS Procedures became effective almost two months later in January 2015 (NVSS Procedures, *supra*, NVSS Overview), the CDCR could have included the Proposition 47 definition of "unreasonable risk of danger to public safety" had the CDCR intended it to apply in the NVSS parole review proceedings.

Under the applicable standards, we have no difficulty concluding that *some evidence* (other than the minimum elements of the crime for which Ilasa was committed) supports both the Board's finding that "the inmate does not hesitate to use violence and weapons to get the things he believes he wants" and the Board's ultimate determination that Ilasa poses a current unreasonable risk to public safety. As part of the search that preceded the arrest for the crime of which Ilasa was convicted (felon in possession of a firearm), police found: a substantial amount of ammunition stored in boxes in an entertainment center and his bedroom closet; a small armory in his children's room; a 7.35 caliber rifle in the closet in a spare bedroom; a loaded 9 mm. magazine containing 10 rounds next to a 9 mm. pistol in his vehicle; and three red bandanas in a closet.[19] Red is the color of two criminal street gangs with which Ilasa was associated, and Ilasa told police that he needed the 9 mm. pistol for protection because he lived in rival street gang territory. Ilasa's prior criminal record includes a 1991 conviction of misdemeanor battery, a 1992 conviction of second degree burglary, and a 1993 conviction of two counts of felony robbery for which he was sentenced to five years in prison. The first robbery involved taking a vehicle from the victim at gunpoint; and the second robbery

---

[19] The existence of considerable ammunition is not among the elements of the crime of which Ilasa was committed. He pled guilty to one count of *possession of a firearm* by a felon under former section 12021, subdivision (a)(1) — the elements of which were "conviction of a felony and ownership, possession, custody or control of a firearm capable of being concealed on the person." (*People v. Snyder* (1982) 32 Cal.3d 590, 592; compare former § 12316, subd. (b)(1) & (3) [*possession of ammunition* by a person prohibited from owning or possessing a firearm is a different crime].)

occurred at a liquor store, where Ilasa violently attacked the clerk with a beer can until the clerk was able to escape by crawling away and hiding in a cooler.

At oral argument, counsel for Ilasa stressed that, because the record contains no evidence of gang activity since his conviction of the commitment offense — i.e., no evidence of gang activity since Ilasa's incarceration — there cannot be some evidence that he presents a *current* unreasonable risk of violence to public safety. However, the standard is not current evidence of an unreasonable risk of violence; "the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be *predictive of current dangerousness* many years after commission of the offense." (*Shaputis I, supra,* 44 Cal.4th at pp. 1254-1255, italics added.) Ilasa's prior gang activity is only one part of Ilasa's history of violent conduct that includes battery, burglary, two robberies (one involving an assault and one involving a battery) and the stockpiling guns and ammunition in his residence. In determining whether to parole an inmate serving an indeterminate sentence, the Board may consider circumstances which, when taken alone may not establish unsuitability for parole, nonetheless "may contribute to *a pattern which results in a finding of unsuitability*."[20] (Regs., § 2402, subd. (b), italics added.) Based

***

[20]    We acknowledge that the standards for parole under the Regulations and under the NVSS Procedures are not identical. (Compare Regs., § 2402, subd. (a) [whether the inmate's release "will pose an unreasonable risk of danger to society"] with NVSS Procedures, *supra*, Hearing Officers and Procedures [whether the inmate's release "would pose an unreasonable risk to public safety"].) However, since we have determined the standard of judicial review of the Board's decisions for parole of NVSS inmates based on the standard of judicial review of the Board's decisions for parole of indeterminately

on the pattern of Ilasa's *past* violent conduct cited by the Board, the record here provides *some evidence* sufficient to support the Board's ultimate determination that, if Ilasa were released, he would pose a *current* unreasonable risk to public safety.

Accordingly, Ilasa has not demonstrated that his due process rights were violated during the Board's review under the NVSS Procedures, *supra*.

DISPOSITION

Ilasa's petition for writ of habeas corpus is denied.

IRION, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.

---

sentenced inmates, we find persuasive the language in the regulations regarding the information the Board may consider in determining indeterminately sentenced inmates' suitability for parole.