Filed 2/25/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ALEXEI KAVANAUGH on Habeas Corpus. | D076500 (Super. Ct. No. HC23654; SCD238494; SCD239633; SCD240841) |
| In re ALBERTO J. MORENO on Habeas Corpus. | D076821 (Super. Ct. No. HCN1586; SCN367442) |
| In re LARRY SMITH on Habeas Corpus. | D077003 (Super. Ct. No. HC19685; SCD208823) |

CONSOLIDATED APPEAL from orders of the Superior Court of San Diego County, Howard H. Shore and Harry M. Elias, Judges. Reversed.

Xavier Becerra, Attorney General, Phillip J. Lindsay, Assistant Attorney General, Amanda J. Murray and Linnea D. Piazza, Deputy Attorneys General, for Appellant California Department of Corrections and Rehabilitation.

Angela Bartosik, Chief Public Defender, and Euketa Oliver, Public Defender, for Respondents Alexei Kavanaugh, Alberto J. Moreno, and Larry Smith.

# I

# INTRODUCTION

In 2016, voters approved Proposition 57, the "Public Safety and Rehabilitation Act of 2016." Proposition 57 amended the California Constitution to grant early parole consideration to persons convicted of a nonviolent felony offense. (Cal. Const., art I, § 32, subd. (a)(1).)[1] It also authorized the California Department of Corrections and Rehabilitation (CDCR) to adopt regulations in furtherance of its guarantee of early parole consideration. (*Id.*, subd. (b).) Acting pursuant to this authority, CDCR issued regulations governing early parole consideration for persons serving a determinate sentence for a nonviolent felony offense. (Cal. Code Regs. tit. 15, §§ 2449.1, 2449.3–2449.7, 3490–3493[2] (hereafter, the parole regulations).)

Petitioners Alexei Kavanaugh, Alberto Moreno, and Larry Smith (hereafter, the petitioners) were denied parole release under the procedures established by the parole regulations. In separate habeas corpus proceedings challenging the parole denials, the trial courts invalidated the parole regulations and ordered new parole consideration proceedings for the petitioners. The courts found the parole regulations are unconstitutional because they do not guarantee the assistance of legal counsel for potential parolees, they do not require in-person parole hearings, and they permit individual hearing officers—rather than multi-member panels—to make parole release decisions. According to the courts, the parole regulations conflict with section 32's guarantee of parole consideration and violate prisoners' procedural due process rights.

---

[1] Subsequent references to section 32 are to article I, section 32 of the California Constitution.

[2] Subsequent references to Regulations are to the Code of Regulations.

In contrast to the trial courts, we conclude the parole regulations do not conflict with the constitutional guarantee of parole consideration or violate due process. Section 32 broadly ensures parole consideration for eligible felons, but it does not specify the procedures governing the parole consideration process. Rather, it vests CDCR with authority to adopt regulations in furtherance of its guarantee of parole consideration. CDCR acted within its mandate by enacting the parole regulations. Further, the parole regulations do not impinge on the procedural due process rights of prisoners seeking parole. They require annual parole eligibility reviews, set forth sufficiently definite criteria governing parole release decisions, mandate a written statement of reasons for each parole release decision, and grant prisoners notice of the parole proceeding, an opportunity to submit a written statement to the Board of Parole Hearings (the Board), and the right to seek review of an adverse decision. These features adequately safeguard against arbitrary and capricious parole release decisions.

Because we conclude the parole regulations are consistent with section 32's guarantee of parole consideration and do not violate prisoners' procedural due process rights, we reverse the orders granting the petitioners' habeas corpus petitions.

## II
## BACKGROUND
### A
#### *Legal Background*
##### 1

In the November 2016 general election, California voters approved Proposition 57. Proposition 57 added section 32 to the California Constitution. (Prop. 57, § 3.) Section 32, subdivision (a)(1) states in

pertinent part as follows: "Parole Consideration: Any person convicted of a nonviolent felony offense and sentenced to state prison shall be eligible for parole consideration after completing the full term for his or her primary offense." (§ 32, subd. (a)(1).) The expressed goals of the early parole consideration provision are "to enhance public safety, improve rehabilitation, and avoid the release of prisoners by federal court order …." (*Id.*, subd. (a).)

Section 32, subdivision (b) instructs CDCR to adopt implementing regulations for the early parole consideration provision set forth in section 32, subdivision (a)(1). It states that CDCR "shall adopt regulations in furtherance of these provisions, and the Secretary of [CDCR] shall certify that these regulations protect and enhance public safety." (§ 32, subd. (b).)

2

CDCR promulgated the parole regulations pursuant to section 32, subdivision (b).[3] Under the parole regulations, a person sentenced to a determinate term for a nonviolent felony is generally eligible for early parole consideration when he or she has served the full term of his or her primary

---

[3] CDCR issued separate regulations that "excluded [from parole consideration prisoners] serving indeterminate terms. [Citation.] Those regulations were found to be invalid because they conflicted with section 32's intent [citation], and the CDCR subsequently enacted new regulations that did not exclude all of those serving indeterminate terms." (*In re Chavez* (2020) 51 Cal.App.5th 748, 752, fn. 7.) The new regulations governing parole consideration for indeterminately-sentenced nonviolent felons (see Regs., tit. 15, §§ 2449.30–2449.34, 3495–3497) are not at issue in this appeal.

offense.[4]  (Regs., tit. 15, §§ 3490, subds. (e)–(f); 3492, subd. (a).)  CDCR conducts the parole eligibility reviews and refers eligible prisoners to the Board for parole consideration on the merits.  (*Id.*, §§ 3491, subds. (c)–(e); 3492, subds. (a)–(b).)  Eligibility reviews are conducted annually "until the inmate is released from custody or is no longer eligible for parole consideration …."  (*Id.*, § 3492, subd. (b); see *id.*, § 2449.4, subd. (h).)

If a prisoner is found eligible for parole consideration and referred to the Board, the Board must provide notification about the pending parole review to the prisoner, the prosecuting agency, and the victim(s) who were harmed by the prisoner's crime(s).  (Regs., tit. 15, §§ 2449.3; 3492, subd. (c).)  The Board must also afford the prisoner, the prosecuting agency, and the victim(s) an opportunity to submit a written statement to the Board.  (*Ibid.*)

A hearing officer—defined by regulation as a Board commissioner, a deputy commissioner, an associate chief deputy commissioner, or the Chief Hearing Officer (Regs., tit. 15, § 2449.1, subd. (g))—must then review the "case on the merits and determine whether to approve the inmate's release," (*id.*, § 2449.4, subd. (a)).  When conducting the merits review, the hearing officer must "review and consider all relevant and reliable information" including but not limited to the prisoner's central file, the prisoner's documented criminal history, and any written statements submitted by the

---

4    The parole regulations exclude from parole consideration any inmate who "is convicted of a sexual offense that currently requires or will require registration as a sex offender under the Sex Offender Registration Act, codified in Sections 290 through 290.024 of the Penal Code."  (Regs., tit. 15, § 3491, subd. (b)(3).)  After briefing in this appeal was complete, the Supreme Court issued *In re Gadlin* (2020) 10 Cal.5th 915 (*Gadlin*), which determined the eligibility exclusion pertaining to sex offenders conflicts with section 32 and is therefore invalid.  The sex offender eligibility exclusion is not germane to this appeal, as the trial courts did not rely on the exclusion as a basis to invalidate the parole regulations.

prisoner, the prosecuting agency, and/or the victim(s).  (*Id.*, subd. (b).)  The hearing officer must weigh various aggravating and mitigating factors pertaining to the prisoner's current conviction(s), prior criminal conviction(s) and behavior, and institutional behavior, work history, and rehabilitative programming, as well as the written statements received by the Board.  (*Id.*, § 2449.5, subds. (a)–(h).)  The factors are "general guidelines" and "the importance attached to any factor or combination of factors in a particular case is left to the judgment of the hearing officer."  (*Id.*, subd. (a).)

The hearing officer must then issue a written decision, supported by a statement of reasons, determining whether the prisoner poses a current, unreasonable risk of violence or a current, unreasonable risk of significant criminal activity.  (Regs., tit. 15, § 2449.4, subds. (c)–(d).)  If the hearing officer finds the prisoner poses such a risk, the hearing officer must deny parole release.  (*Id.*, subd. (e).)  If the hearing officer finds the prisoner does not pose such a risk, the hearing officer must grant parole release.  (*Id.*, subd. (f).)  But, if the parole release decision will result in the prisoner's release two or more years prior to his or her earliest possible release date, the parole release decision must be reviewed by an associate chief deputy commissioner or the Chief Hearing Officer, who may concur with the decision or issue a new decision approving or denying the parole release.  (*Ibid.*)

Within 30 days of being served with the hearing officer's parole release decision, the prisoner may request review of the decision.  (Regs., tit. 15, §§ 2449.4, subd. (i); 2449.7, subd. (a).)  The request for review must "include a description of why the inmate believes the previous decision was not correct and may include additional information not available to the hearing officer at the time the previous decision was issued."  (*Ibid.*)  A hearing officer not involved in the original decision must then, within 30 days of the Board's

6

receipt of the request for review, "consider all relevant and reliable information and issue a decision either concurring with the previous decision or overturning the previous decision with a statement of reasons supporting the new decision." (*Id.*, subds. (c)–(d).)

B

*Lower Court Proceedings*

This appeal arises from three separate habeas corpus proceedings in which the trial courts found the parole regulations are unconstitutional.

1

*Petitioners' Parole Denials*

In 2013, Kavanaugh pleaded guilty to three counts of obtaining and using personal identifying information of another person (Pen. Code, § 530.5), one count of obtaining a controlled substance by fraud (Health & Saf. Code, § 11173, subd. (a)), one count of possession of a concealed firearm as an individual with a prior violent felony conviction (Pen. Code, § 29900, subd. (a)(1)), and one count of making a criminal threat (Pen. Code, § 422), and he admitted an on-bail enhancement (Pen. Code, § 12022.1) and a strike prior (Pen. Code, §§ 667, subds. (b)–(i); 1170.12). He was sentenced to a determinate term of 14 years eight months in prison. In 2017, and again in 2018, a hearing officer reviewed Kavanaugh's case for early parole consideration, found Kavanaugh posed an unreasonable risk to the community, and denied release.

In 2017, Moreno pleaded guilty to one count of unlawful taking of personal property (Pen. Code, § 484), and admitted a strike prior (Pen. Code, §§ 667, subds. (b)–(i); 1170.12) and a prison prior (Pen. Code, § 667.5). He was sentenced to a determinate term of five years in prison. In 2018, a hearing officer reviewed Moreno's case for early parole consideration, found

7

Moreno posed an unreasonable risk to the community, and denied release. At Moreno's request, a second hearing officer reviewed the parole denial, found no error, and concurred with the initial decision denying parole.

In 2010, a jury convicted Smith of 18 counts of grand theft (Pen. Code, § 487, subd. (a)), two counts of conspiracy to commit grand theft (Pen. Code, § 182, subd. (a)(1)), and one count of prohibited practices by a foreclosure consultant (Civ. Code, § 2945.4), and Smith admitted eight strike priors (Pen. Code, §§ 667, subds. (b)–(i); 1170.12). Smith was sentenced to a determinate term of 20 years four months in prison. In 2017, and again in 2018, a hearing officer reviewed Smith's case for early parole consideration, found Smith posed an unreasonable risk to the community, and denied release. Smith sought review of the 2018 parole denial and a second hearing officer concurred with the initial decision denying parole.

## 2

### *The Habeas Corpus Proceedings*

Each petitioner filed a pro se petition for writ of habeas corpus in the trial court challenging his parole denial(s). Kavanaugh alleged: (1) the Board "used erroneous facts … to deny [him] early release" in violation of his due process rights; and (2) the parole regulation setting forth the parole criteria violated his due process rights and the will of the voters who enacted Proposition 57. Moreno alleged: (1) the parole regulations "do not conform with the actual intent of the California voter's [sic] who approved Proposition 57" because they result in systematic parole denials; and (2) a modicum of evidence did not support his parole denial. In his lengthy, sometimes-unintelligible petition, Smith alleged: (1) a modicum of evidence did not support his parole denial; (2) his parole denial was based on impermissible factors such as Smith's race and the Board's alleged financial

8

interests in keeping Smith incarcerated; and (3) there were sentencing errors in Smith's underlying criminal case.

The trial courts issued virtually identical orders to show cause in each proceeding. The orders to show cause stated as follows: "Petitioner claims the parole process promulgated by CDCR's adoption of regulations for determinately sentenced non-violent offenders violates his due process rights for early parole consideration provided under the California Constitution. [The] court finds that Petitioner has made a prima facie case for relief and hereby issues an Order to Show Cause as to why relief should not be granted. [The] court requests that the Return focus on the following issue[] … [¶] Do California Code of Regulations, Title 15, Division 2, Chapter 3, sections 2449.1, 2449.2, 2449.4, 2449.5, and 2449.7 satisfy an inmate's due process right to receive 'due consideration' for parole?"[5]

The People filed a return to each order to show cause and the petitioners each filed a denial.

The trial courts granted all three petitions for writs of habeas corpus on grounds that the parole regulations are unconstitutional. The courts found the parole regulations are unconstitutional because they do not guarantee the assistance of legal counsel for potential parolees, permit in-person parole hearings, or mandate that parole decisions be made by multi-member parole panels. The courts found these alleged deficiencies failed to ensure parole consideration under section 32 and violated prisoners' procedural due process

_____

[5]     The orders to show cause requested that the returns focus on a second issue as well—whether the Board's then-existing process of conducting jurisdictional reviews conflicted with Proposition 57. In response to *In re McGhee* (2019) 34 Cal.App.5th 902 (*McGhee*), CDCR repealed the pertinent regulation requiring jurisdictional reviews (Regs., tit. 15, former § 2449.2). The jurisdictional review process, which no longer exists, is not at issue in this appeal.

rights under the California Constitution.[6]  Based on these findings, the courts ordered new parole proceedings for the petitioners and ordered CDCR to repeal and amend the parole regulations.

Subsequently, all three petitioners were released from prison for reasons unrelated to the habeas corpus proceedings.  Kavanaugh was granted parole under the standard parole consideration procedures set forth in the parole regulations.  Smith was released from prison under Government Code section 8658 in response to the COVID-19 pandemic.  Moreno was released from prison as well, though the basis for his release is not apparent from the appellate record.[7]

The People appeal the orders granting the habeas corpus petitions, which were stayed pending appeal.[8]

### III

### DISCUSSION

### A

*Summary of the Habeas Corpus Procedure*

"Our state Constitution guarantees that a person improperly deprived of his or her liberty has the right to petition for a writ of habeas corpus."

---

[6]  The courts characterized the petitioners' alleged due process violations as arising under the California Constitution.  They also relied exclusively on judicial authorities interpreting the due process clause of the California Constitution.  It is therefore apparent the courts based their rulings on the due process guarantee of the California Constitution, not the federal Constitution.

[7]  We grant the People's request for judicial notice of the hearing officer's decision approving Kavanaugh's parole release and the prison release records and change in status notifications for all three petitioners.  (Evid. Code, § 452, subd. (c).)

[8]  The petitioners' release from prison does not moot the appeal of the trial court orders, given that the orders invalidated the parole regulations.

10

(*People v. Duvall* (1995) 9 Cal.4th 464, 474 (*Duvall*).) "[T]he petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them." (*Ibid.*) "The petition 'must allege unlawful restraint, name the person by whom the petitioner is so restrained, and specify the facts on which [the petitioner] bases his [or her] claim that the restraint is unlawful.'" (*People v. Romero* (1994) 8 Cal.4th 728, 737 (*Romero*).)

A court presented with a petition for a writ of habeas corpus "must first determine whether the petition states a prima facie case for relief—that is, whether it states facts that, if true, entitle the petitioner to relief—and also whether the stated claims are for any reason procedurally barred." (*Romero, supra*, 8 Cal.4th at p. 737.) " 'The court determines *on the basis of the allegations of the original petition* …, as well as the supporting documentary evidence and/or affidavits, which should be attached if available, whether a prima facie case entitling the petitioner to relief if the allegations are proven has been stated.' " (*In re Reno* (2012) 55 Cal.4th 428, 458, fn. 15.)

"If no prima facie case for relief is stated, the court will summarily deny the petition." (*Duvall, supra*, 9 Cal.4th at p. 475.) "When, on the other hand, a habeas corpus petition is sufficient on its face (that is, the petition states a prima facie case on a claim that is not procedurally barred), the court is obligated by statute to issue a writ of habeas corpus," i.e., a command to "the person having custody of the petitioner to bring the petitioner 'before the court or judge before whom the writ is returnable' … and to submit a written return justifying the petitioner's imprisonment or other restraint on the petitioner's liberty [citation]." (*Romero, supra*, 8 Cal.4th at pp. 737–738.)

"Because 'appellate courts are not equipped to have prisoners brought before them ... [they] developed the practice of ordering the custodian to show cause why the relief sought should not be granted.' " (*Romero, supra*, 8

11

Cal.4th at p. 738.) "Many superior courts have likewise adopted the practice of issuing an order to show cause in place of the writ of habeas corpus when a habeas corpus petition states a prima facie case for relief." (*Ibid.*) The order to show cause directs the custodian to file a pleading called a return, which " 'becomes the principal pleading' [citation] and is 'analogous to the complaint in a civil proceeding' [citations]." (*Ibid.*) The return must allege facts establishing the legality of the petitioner's detention. (*Id.* at pp. 738–739.)

Upon the filing of the return, the petitioner may file a response, known as a traverse (or a denial in the trial court), in which the petitioner "may deny or controvert any of the material facts or matters set forth in the return, or except to the sufficiency thereof, or allege any fact to show either that his imprisonment or detention is unlawful, or that he is entitled to his discharge." (Pen. Code, § 1484; Cal. Rules of Court, rule 4.551.) The traverse (or denial) "is analogous to the answer in a civil proceeding." (*Romero*, *supra*, 8 Cal.4th at p. 739.) "[I]t is through the return and the traverse [or denial] that the issues are joined in a habeas corpus proceeding." (*Ibid.*)

"Once the issues have been joined in this way, the court must determine whether an evidentiary hearing is needed. If the written return admits allegations in the petition that, if true, justify the relief sought, the court may grant relief without an evidentiary hearing. [Citations.] Conversely, consideration of the written return and matters of record may persuade the court that the contentions advanced in the petition lack merit, in which event the court may deny the petition without an evidentiary hearing. [Citations.] Finally, if the return and traverse [or denial] reveal that petitioner's entitlement to relief hinges on the resolution of factual disputes, then the court should order an evidentiary hearing…. After the evidentiary hearing, the court in which the return has been filed will then

12

either grant or deny relief based upon the law and the facts as so determined." (*Romero, supra,* 8 Cal.4th at pp. 739–740.)

B

*The Petitioners Challenged the Parole Regulations*
*in Their Habeas Corpus Petitions*

Before we address the merits of the trial courts' constitutional rulings, we consider a predicate procedural question—whether the trial courts impermissibly expanded the scope of the habeas corpus proceedings beyond the claims that were presented in the petitioners' habeas corpus petitions.

The People contend the petitioners challenged only the sufficiency of the evidence supporting their parole denials and, in Kavanaugh's case, the validity of the parole regulation setting forth the parole criteria. However, the trial courts issued orders to show cause, and subsequently granted habeas relief, on grounds that the parole regulations are inconsistent with section 32 and violative of prisoners' due process rights. According to the People, the courts exceeded their authority in addressing and granting relief based on claims that were not raised in the habeas corpus petitions.

The issues in a habeas corpus proceeding are defined by the pleadings and "may not extend beyond the claims alleged in the habeas corpus petition." (*Board of Prison Terms v. Superior Court* (2005) 130 Cal.App.4th 1212, 1235 (*Ngo*).) Thus, a court exceeds its authority when it "issue[s] an order to show cause that requires the respondent to address new claims not expressly or implicitly raised in the original habeas corpus petition or supported by the factual allegations in the original habeas corpus petition, unless those claims were raised … in a supplemental or amended habeas corpus petition filed with the permission of the court." (*Id.* at p. 1237.)

On the other hand, "[t]he goal … of the procedures that govern habeas corpus is to provide a framework in which a court can discover the truth and

13

do justice in timely fashion." (*Duvall*, *supra*, 9 Cal.4th at p. 482.) Therefore, courts "should not construe the pleadings in … a parsimonious fashion." (*Ibid.*) Further, a court "crafting [an] order to show cause has the power to explain its preliminary assessment of the petitioner's claims, *restate inartfully drafted claims for purposes of clarity*, and limit the issues to be addressed in the return to only those issues for which a prima facie showing has been made." (*Ngo*, *supra*, 130 Cal.App.4th at p. 1239, italics added.)

It is a fairly close call whether the trial courts' orders to show cause and orders granting habeas relief addressed claims that were presented in the habeas corpus petitions. As the People note, the petitions focused largely on the alleged insufficiency of the evidence supporting the petitioners' parole denials and, to a lesser extent, the criteria governing parole release decisions. Those issues appear to be distinct from the matters discussed in the orders to show cause and the orders granting habeas relief. Nevertheless, upon close examination, it is apparent to us that each petition *also* alleged a due process violation or an arbitrary and capricious parole release decision, as well as an irreconcilable conflict between the Board's parole consideration procedures and section 32 (referred to as Proposition 57 in the habeas corpus petitions).

For instance, Kavanaugh alleged the parole regulations violated his "right to due process" and the Board "implemented policies (under Proposition 57) that the voters never intended …." Moreno alleged that his parole denial was "arbitrary and procedurally flawed," and that CDCR "systematically deni[ed] him and other inmates … the full benefit's [sic] of Proposition 57, by adopting regulation[s] … which do not conform with the actual intent of the California voter's [sic] who approved Proposition 57 …." Similarly, Smith alleged the Board deprived him of "earned liberty interests without due process of enacted laws," and "failed and/or refused to exercise

14

sound discretion governed by legal rules, valid, enacted laws[] [and] to do justice according to such laws in conducting hearings, receiving and reviewing evidence, and … issu[ing] rulings ….” (Quotation marks and underline omitted.)

Based on these allegations, as well as the policies underpinning the procedures governing habeas corpus proceedings, we conclude the petitioners’ pro se habeas corpus petitions sufficiently alleged the claims upon which habeas corpus relief was granted.  (See *In re Lewis* (2009) 172 Cal.App.4th 13, 27 [habeas corpus petition raised constitutional vagueness challenge to parole regulations by alleging the Board acted in an arbitrary and capricious manner].)  It follows that the trial courts did not impermissibly expand the scope of the habeas corpus proceedings.[9]  Therefore, we proceed to the merits of the trial courts’ orders granting habeas relief.

C

*The Parole Regulations Ensure Parole Consideration*

As previously noted, section 32, subdivision (a)(1) states as follows: “Any person convicted of a nonviolent felony offense and sentenced to state prison shall be eligible for parole consideration after completing the full term for his or her primary offense.”  The petitioners contend section 32’s guarantee of parole consideration for eligible felons includes an implicit promise that such felons will receive the assistance of legal counsel during the parole process, as well as in-person parole hearings and multi-member

---

[9]     In their appellate brief, the petitioners contend the hearing officer relied on inadmissible and unreliable hearsay to deny parole release to Moreno.  Moreno did not allege this as a basis for relief in his habeas corpus petition and the trial court did not mention it in the order granting Moreno’s habeas corpus petition.  Therefore, the hearing officer’s alleged reliance on hearsay is not properly before us.

15

parole panels. They claim the parole regulations conflict with section 32 because the parole regulations do not fulfill this alleged promise.

The People argue there is no conflict between section 32's guarantee of parole consideration and the parole regulations. They emphasize that section 32 does not impose express procedural requirements applicable to the parole consideration process. They also contend that section 32, subdivision (b) commands CDCR to adopt regulations in furtherance of the new parole consideration requirement. According to the People, CDCR acted in accordance with this directive when it issued the parole regulations.

For the following reasons, we agree with the People.

1

*Legal Standards*

"A regulation adopted by a state agency, like any agency action, comes to the court with a presumption of validity." (*Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1047–1048.) "In determining the proper interpretation of a statute [or constitutional provision such as section 32] and the validity of an administrative regulation, the administrative agency's construction is entitled to great weight, and if there appears to be a reasonable basis for it, a court will not substitute its judgment for that of the administrative body." (*Ontario Community Foundations, Inc. v. State Bd. of Equalization* (1984) 35 Cal.3d 811, 816.) " ' "Our function is to inquire into the legality of … regulations, not their wisdom." ' " (*Gadlin, supra,* 10 Cal.5th at p. 926.)

On the other hand, an agency has no authority to adopt a regulation unless it is " '[1] consistent and not in conflict with the [enabling] statute [or constitutional provision] and [2] reasonably necessary to effectuate the purpose of the [enabling] statute [or constitutional provision].' " (Gov. Code,

16

§ 11342.2; see *Gadlin*, *supra*, 10 Cal.5th at p. 926.)  In assessing whether the regulation is consistent with an enabling statute or constitutional provision, we must ask " 'whether the regulation alters or amends the governing [mandate] or case law, or enlarges or impairs its scope.' " (*Association of California Ins. Cos. v. Poizner* (2009) 180 Cal.App.4th 1029, 1045.)

"In construing ... section 32, subdivision (a)(1), we apply normal standards governing the interpretation of constitutional provisions. ' "[O]ur primary concern is giving effect to the intended purpose of the provisions at issue. [Citation.]  In doing so, we first analyze provisions' text in their relevant context, which is typically the best and most reliable indicator of purpose.  [Citations.]  We start by ascribing to words their ordinary meaning, while taking account of related provisions and the structure of the relevant statutory and constitutional scheme.  [Citations.]  If the provisions' intended purpose nonetheless remains opaque, we may consider extrinsic sources, such as an initiative's ballot materials.  [Citation.]  Moreover, when construing initiatives, we generally presume electors are aware of existing law. [Citation.]  Finally, we apply independent judgment when construing constitutional … provisions." ' " (*McGhee*, *supra*, 34 Cal.App.5th at p. 909.)

2

*There is no Conflict Between the Parole Regulations and*
*Section 32's Guarantee of Parole Consideration*

To assess whether a conflict exists between section 32 and the parole regulations, we begin by examining the language of section 32.  (*Gadlin*, *supra*, 10 Cal.5th at p. 926; *McGhee*, *supra*, 34 Cal.App.5th at p. 909.) Section 32 broadly states in pertinent part that certain qualifying felons "shall be eligible for parole consideration …."  (§ 32, subd. (a)(1).)

The parties have not directed us to any constitutional or statutory definitions for the term "parole consideration," and we are aware of none

17

based on our own research.  In the absence of such definitions, we presume the words were intended to be understood " 'in [their] ordinary sense and, consequently, we may refer to [those words'] dictionary definition[s] to ascertain [their] ordinary, usual meaning.' " (*Russell City Energy Co., LLC v. City of Hayward* (2017) 14 Cal.App.5th 54, 64; see *Cacho v. Boudreau* (2007) 40 Cal.4th 341, 349 ["In the absence of a statutory definition, we assume that the Legislature intended that 'rent' would have its ordinary meaning …."]; accord *Gadlin*, *supra*, 10 Cal.5th at p. 933 [relying on dictionary definition to interpret the meaning of language contained within section 32].)

Webster's dictionary defines the term "consideration," as relevant here, to mean "the act of regarding or weighing carefully."  (Webster's 3d New Internat. Dict. (2002) p. 484, col. 1.)  Similarly, the online Oxford English Dictionary defines "consideration" to mean "[t]he keeping of a subject before the mind; attentive thought, reflection, meditation."  (<https://www.oed.com/view/Entry/39602?redirectedFrom=consideration#eid> [as of Feb. 24, 2021], archived at <https://perma.cc/2RL4-ADT7>.)  The American Heritage Dictionary gives "consideration" an analogous meaning, defining it as "[c]areful thought; deliberation."  (American Heritage Dict. (5th ed. 2011) p. 392.)  Collectively, these definitions indicate that "parole consideration" refers to the giving of careful thought and deliberation to a person's parole suitability.

When the term "parole consideration" is given this common and ordinary meaning, it is apparent the parole regulations are in harmony with section 32.  The parole regulations require the referral of each eligible prisoner to the Board for a parole assessment whereby a hearing officer reviews all relevant information and applies criteria to determine whether the prisoner poses a risk of violence or significant criminal activity.  (Regs.

18

tit. 15, §§ 2449.4, subds. (a)–(c); 2449.5; 3491, subd. (a).) Depending on the outcome of the assessment, the hearing officer then approves or denies parole release. (*Id.*, §§ 2449.4, subds. (e)–(f); 3493.) In short, the Board affords parole consideration to the prisoner when the hearing officer reviews the prisoner's record and weighs various factors bearing on the prisoner's parole suitability in order to reach a reasoned parole release decision.

Our interpretation is bolstered by the fact that section 32 does not expressly mandate any procedures for the parole consideration it guarantees, let alone the features emphasized by the petitioners. The measure's drafters could have defined "parole consideration" to incorporate such procedural requirements.[10] Or they could have imposed the procedural requirements in other provisions of the measure. It is not our role to insert this language— language the voters never considered or approved—into section 32. (*People v. Roach* (2016) 247 Cal.App.4th 178, 183 ["Our job is to ascertain and declare what is in terms or in substance contained in the provision, not to insert what has been omitted or omit what has been inserted."]; *Hodges v. Superior Court* (1999) 21 Cal.4th 109, 114 ["In the case of a voters' initiative … we may not properly interpret the measure in a way that the electorate did not contemplate: the voters should get what they enacted, not more and not less."]; accord *Gadlin, supra*, 10 Cal.5th at p. 935 ["Had the drafters of Proposition 57, and by extension the voters, intended to exclude inmates from nonviolent offender parole consideration based on prior or current sex offense convictions, it would have been a simple matter to say so explicitly."].)

In sum, section 32 does not specify any procedural requirements for the parole consideration to which nonviolent felons are entitled. Rather, it

---

10     Section 32 defines the term "full term for the primary offense," but leaves the term "parole consideration" undefined. (§ 32, subd. (a)(1)(A).)

19

charges CDCR to issue regulations implementing its guarantee of parole consideration. (§ 32, subd. (b).) As the Supreme Court has explained, this charge of authority confers on CDCR "meaningful power to promulgate regulations" in furtherance of section 32. (*Gadlin*, *supra*, 10 Cal.5th at p. 934.) In particular, it affords CDCR "ample room to protect public safety by crafting the specific processes under which parole suitability is determined on a case-by-case basis. And [CDCR] has done so; the regulations direct the Board of Parole Hearings to consider 'all relevant and reliable information' ([Regs., tit. 15,] § 2449.4, subd. (b)) to determine whether the inmate poses a 'current, unreasonable risk of violence or a current, unreasonable risk of significant criminal activity' (*id.*, subd. (c)), including an inmate's 'documented criminal history" (*id.*, subd. (b)(1))." (*Ibid.*) We discern no tension between section 32, subdivision (a)'s broad promise of parole consideration and the parole regulations CDCR has adopted.

3

*The Petitioners' Interpretive Arguments Are Unavailing*

In finding a conflict between section 32's guarantee of parole consideration and the parole regulations, the trial courts relied on statutes and regulations governing the parole consideration process for *indeterminately*-sentenced persons. Those statutes and regulations require the appointment of legal counsel for potential parolees (e.g., Pen. Code, § 3041.7), in-person parole hearings (e.g., *id.*, §§ 3041, subd. (a)(2); 3041.5, subd. (a)(2); Regs., tit. 15, §§ 2280, 2304), and multi-member parole panels (e.g., Pen. Code, §§ 3041, subds. (a)(2), (d); Regs., tit. 15, § 2281, subds. (a)– (b), 2315). The courts reasoned the voters who passed Proposition 57 "were aware of the state's parole process" and—by approving "parole consideration" for eligible nonviolent felons—they impliedly adopted all the same procedural

requirements that apply when indeterminately-sentenced prisoners undergo parole consideration. The petitioners repeat these arguments on appeal.

"There is a presumption, though not conclusive, that voters are aware of existing laws at the time a voter initiative is adopted." (*Santos v. Brown* (2015) 238 Cal.App.4th 398, 410.) However, the parole consideration process for indeterminately-sentenced persons was not, as the trial courts apparently assumed, the only parole consideration process in existence at the time the voters enacted Proposition 57. Indeed, in 2009, a three-member federal court found that overcrowding in the prison system caused the state to deliver constitutionally-inadequate medical and mental health care to inmates. (*Coleman v. Schwarzenegger* (E.D. Cal. & N.D. Cal. 2009) 922 F.Supp.2d 882, affd. *sub nom. Brown v. Plata* (2011) 563 U.S. 493.) In connection with this finding, the federal court ordered the state to reduce the population of its adult prisons to 137.5% of their total design capacity (*ibid.*), and issued a remedial order intended to achieve this goal (*In re Ilasa* (2016) 3 Cal.App.5th 489, 500–501 (*Ilasa*)). The order mandated " 'a new parole determination process through which non-violent second-strikers [would] be eligible for parole consideration by the Board ... once they have served 50% of their sentence.' " (*Id.* at p. 495, italics omitted.)

In response to this remedial order, CDCR "created a [parole] process entitled 'Non–Violent, Non–Sex–Registrant, Second–Strike (NVSS) Review,' which was implemented on January 1, 2015." (*Ilasa, supra*, 3 Cal.App.5th at p. 495.) Under the NVSS parole consideration process, prisoners were screened for parole eligibility and referred to the Board for potential release. (*Id.* at p. 502.) Once referred to the Board, the prisoners were permitted to submit a written statement and a single deputy commissioner—not a parole panel—would consider the documentary record and determine whether to

grant parole. (*Id.* at p. 503.) A written parole decision was required, but no in-person parole hearing was held. (*Ibid.*) Under the NVSS parole consideration process, a single associate chief deputy commissioner—not a parole panel—could review the parole decision and issue a decision upholding or vacating the original parole decision. (*Ibid.*) As this brief description demonstrates, the parole regulations establish a parole consideration process that in many respects resembles the NVSS parole consideration process.[11]

Returning to the presumption of voter awareness, it is untenable for us to conclude the voters were somehow *aware* of the parole consideration process available to indeterminately-sentenced felons, yet inexplicably *unaware* of the NVSS parole consideration process. It is equally untenable for us to conclude the voters intended to replicate the former process, as opposed to the latter process—or to adopt a new process altogether—given that the language of Proposition 57 evinces no such intention. In light of this textual omission, we decline to infer through sheer speculation that the voters who passed Proposition 57 intended to adopt the broad and complex swathe of procedural requirements governing parole consideration for

---

[11]   The People request judicial notice of a stipulation executed by the parties to the federal prison-overcrowding lawsuit, which states the parole regulations mirror NVSS review. We deny judicial notice of the stipulation, which is not relevant to the disposition of the appeal.

22

indeterminately-sentenced felons.[12]  (See *Gadlin*, *supra*, 10 Cal.5th at p. 942 ["Without language in the constitutional provision that expressed or strongly implied the authority of the Department to carry out [parole eligibility] exclusions, we cannot say the voters intended such exclusions."].)

The ballot materials for Proposition 57 also do not suggest the voters intended a wholesale adoption of the procedures by which indeterminately-sentenced persons are considered for parole.[13]  "The ballot materials presented to the voters consisted of three sections:  the official title and summary prepared by the Attorney General, the analysis of the Legislative Analyst, and the arguments in favor of and against the proposition (an argument in favor by the proponents followed by a rebuttal by the opponents, and an argument against by the opponents followed by a rebuttal by the proponents)."  (*Gadlin*, *supra*, 10 Cal.5th at p. 936.)  The Legislative Analyst's analysis obliquely references the parole consideration hearings that are provided to indeterminately-sentenced persons *and* the NVSS parole

---

[12]  *McGhee*, *supra*, 34 Cal.App.5th 902 is not to the contrary.  In *McGhee*, the court considered the viability of a regulation requiring CDCR to conduct a prescreening of otherwise eligible inmates before referring those inmates to the Board for parole consideration.  (*Id.* at pp. 906–907.)  The *McGhee* court—applying the presumption that voters were aware of existing parole statutes and regulations—concluded the regulation was inconsistent with Proposition 57's guarantee of parole consideration, which could "only be understood to mean parole consideration by the [B]oard," as opposed to parole consideration by CDCR.  (*Id.* at pp. 909–910.)  The application of the presumption of voter awareness can be explained by the fact that, for purposes of the appeal, there were no material differences between the two parole consideration processes governing indeterminately-sentenced persons and determinately-sentenced second-strike offenders; under both processes, parole consideration was undertaken by the Board, not CDCR.  (*Id.* at pp. 911–912.)  Here, there are material differences between the two parole consideration processes.

[13]  We grant the People's request for judicial notice of the ballot materials for Proposition 57.  (Evid. Code, § 452, subd. (c).)

consideration process. (Ballot Pamp., Gen. Elec. (Nov. 8, 2016) analysis of Prop. 57 by Legislative Analyst, p. 54.) However, neither the analysis nor any other portion of the ballot materials states that the parole consideration guaranteed by Proposition 57 would resemble either of these processes, nor that it would resemble one of the processes to the exclusion of the other.

Further, while the Legislative Analyst's analysis states Proposition 57 would "increase the number of inmates eligible for parole consideration," the analysis—as well as the proponents' arguments in favor of Proposition 57— do not mention *any* of the procedures that might apply when an eligible felon undergoes parole consideration. (Ballot Pamp., Gen. Elec. (Nov. 8, 2016) analysis of Prop. 57 by Legislative Analyst, p. 56; *id.*, argument in favor of Prop. 57, p. 58.) They say nothing about the appointment of legal counsel for prospective parolees, in-person parole hearings, or multi-member parole panels. The ballot materials' silence on these topics strongly suggests the voters did not contemplate them. (*Citizens Assn. of Sunset Beach v. Orange County Local Agency Formation Com.* (2012) 209 Cal.App.4th 1182, 1197 [ballot materials' silence "indicative of the voters' understanding of what they were doing"]; accord *Gadlin*, *supra*, 10 Cal.5th at p. 939 ["If, as [CDCR] asserts, the voters intended to carve out an entire category of offenders from nonviolent parole consideration based on prior criminal history, the[] [ballot materials] sources likely would have mentioned as much."].)

The petitioners make one final argument in support of their claim that the parole regulations irreconcilably conflict with section 32. They assert the parole regulations cause some parole-eligible prisoners to be denied release and remain incarcerated at the expense of the taxpayer. They claim the parole regulations thus contravene one of section 32's objectives—the reduction of public spending on the prison population. (See Prop. 57, § 2 ["[I]t

24

is the purpose and intent of the people of the State of California to … [s]ave money by reducing wasteful spending on prisons."].)  We are not persuaded.

By establishing a parole consideration system that did not previously exist—and ensuring the release of some prisoners who would not otherwise have been subject to parole consideration—the parole regulations clearly *advance* the goal of reducing incarceration-related costs.  Insofar as the petitioners argue the parole regulations do not do enough to reduce public expenditures, that alleged shortcoming does not establish an incompatibility between section 32 and the parole regulations.  Nor does it require us to interpret section 32 in a manner that its language does not support.  (*People v. Morales* (2016) 63 Cal.4th 399, 408 ["Certainly, one purpose was to save money, and the measure has done so by causing the release of some prisoners …. But the purpose of saving money does not mean we should interpret the statute in every way that might maximize any monetary savings."].)

4

*Conclusion*

Section 32 guarantees parole consideration for eligible persons who have been sentenced to prison for a nonviolent felony offense.  But it does not mandate any specific parole consideration procedures.  Rather, it vests authority with CDCR to craft the specific processes under which parole suitability is determined.  (*Gadlin*, *supra*, 10 Cal.5th at p. 934.)  CDCR

properly exercised this authority in its enactment and implementation of the parole regulations.[14]

D

*The Parole Regulations Do Not Violate the Due Process Clause*

The trial courts found the parole regulations are unconstitutional, in the alternative, on grounds that the parole regulations deprive prospective parolees of their rights to procedural due process. The courts found the parole regulations run afoul of the California Constitution's due process clause for the reasons previously discussed—i.e., because they do not guarantee the appointment of legal counsel for prisoners undergoing parole consideration, in-person parole hearings, or multi-member parole panels. On appeal, the petitioners contend the parole regulations violate their due process rights for these same reasons. They also assert the parole regulation setting forth the criteria for parole release decisions is void-for-vagueness.

The People assert the parole regulations afford prisoners the procedural due process to which they are entitled. The People claim the parole regulations ensure that eligible prisoners receive reasonable notice and a reasonable opportunity to be heard, both before the parole release decision is made and prior to any subsequent review of an adverse decision. Further, the People claim the additional safeguards promoted by the petitioners would impose undue fiscal and administrative burdens on the state that are not commensurate with the limited liberty interests at stake in

---

[14] The petitioners assert in passing that the parole regulations are unconstitutional because they "impermissibly amend" Proposition 57. The petitioners provide no substantive analysis or pertinent legal authorities supporting their claim that the parole regulations impermissibly amended a voter initiative. Therefore, the argument is waived. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)

a parole release decision. In response to the petitioners' void-for-vagueness challenge, the People assert the parole criteria regulation is sufficiently definite to guide the Board's exercise of discretion when making parole release determinations.

Once again, we agree with the People.

1

*Legal Standards*

Parole release proceedings are "informal, in contrast to judicial or formal administrative proceedings." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 654–655 (*Rosenkrantz*).) "[P]arole release decisions concern an inmate's anticipation or hope of freedom, and entail the Board's attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." (*Id.* at p. 655.) The Board must consider criteria set forth in regulations established by CDCR. (*Id.* at pp. 653–654; *In re Shaputis* (2008) 44 Cal.4th 1241, 1256 (*Shaputis*) [regulations "guide the Board's assessment of whether [an] inmate … is suitable for parole"].) However, the Board has broad discretion in making parole release decisions. (*Rosenkrantz*, at p. 655.) " 'The [Board's] discretion in parole matters has been described as 'great' [citation] and 'almost unlimited' [citation].' " (*Ibid.*, quoting *In re Powell* (1988) 45 Cal.3d 894, 902 (*Powell*).)

"Although broad, the [B]oard's discretion is not absolute. That discretion … is subject to the prisoner's right to procedural due process." (*Powell*, *supra*, 45 Cal.3d at p. 902.) A prisoner "is not entitled to … receive parole, [but] he is entitled to have his application for the[] benefit[] 'duly considered.' " (*In re Minnis* (1972) 7 Cal.3d 639, 646 (*Minnis*).) By way of example, the Board may not categorically deny parole to all persons who have

27

been imprisoned for committing a particular offense.  (*Id.* at pp. 642–648.) Because "a right to due consideration of parole applications necessarily gives rise to a concomitant right to an available remedy.… [¶] ... [¶] ... due process requires that the [Board] support its determinations with a statement of its reasons therefor." (*In re Sturm* (1974) 11 Cal.3d 258, 268–270.)  Further, courts may conduct limited judicial review of parole denials to determine whether the denials are supported by "some evidence," given that a denial without "some evidence" would be "arbitrary and capricious, thereby depriving the prisoner of due process of law." (*Rosenkrantz, supra*, 29 Cal.4th at p. 657–658; see *Shaputis*, 44 Cal.4th at pp. 1254–1255 [clarifying scope of judicial review].)

In assessing a due process claim, we conduct a "case by case determination of whether a particular incident of due process is required for parole decisions …." (*Sturm, supra*, 11 Cal.3d at p. 266.)  We apply the balancing test announced in *People v. Ramirez* (1979) 25 Cal.3d 260 (plur. opn. of Mosk, J.) (*Ramirez*), to assess the amount of process that is required under the circumstances.[15]  Under the *Ramirez* test, we consider the following factors:  "(1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official, and (4) the governmental interest, including the function involved and the fiscal

---

[15]    Although the *Ramirez* decision was a plurality decision, a unanimous Supreme Court subsequently applied the *Ramirez* balancing test in *In re Jackson* (1987) 43 Cal.3d 501.

and administrative burdens that the additional or substitute procedural requirement would entail."[16] (*Id.* at p. 269.)

The *Ramirez* balancing test recognizes "that 'due process is flexible and calls for such procedural protections as the particular situation demands.' " (*Ramirez, supra,* 25 Cal.3d at p. 268; see *Minnis, supra,* 7 Cal.3d at p. 649 ["The exact boundaries of due process 'are undefinable, and its content varies according to specific factual contexts.' "].)  In some contexts, due process may require "formal hearing procedures that include the rights of confrontation and cross-examination, as well as a limited right to an attorney." (*Ramirez,* at p. 269.)  "In others, due process may require only that the administrative agency comply with the statutory limitations on its authority." (*Ibid.*)

2

*Prisoners Do Not Have a Due Process*
*Right to Legal Counsel for Parole Proceedings*

At the outset, we will address the question of whether due process mandates the assistance of legal counsel for prospective parolees in parole release proceedings.  We need not conduct a full-blown *Ramirez* analysis or engage in an extended discussion on this question because our Supreme Court has already answered this question in the negative.

In *In re Schoengarth* (1967) 66 Cal.2d 295, a prisoner filed a petition for writ of habeas corpus challenging the denial of his request for appointment of legal counsel during parole proceedings.  The Supreme Court denied the petition and ruled the prisoner had no constitutional right to legal counsel.

_____

16    "[O]ther than the addition of the dignity factor, the *Ramirez* balancing test for determining what procedural protections are warranted, given the governmental and private interests involved, is essentially identical to that employed under the federal analysis." (*Ryan v. California Interscholastic Federation-San Diego Section* (2001) 94 Cal.App.4th 1048, 1071, citing *Matthews v. Eldridge* (1976) 424 U.S. 319, 335, 347–349.)

(*Id.* at pp. 304, 306.) As the Court explained, "[t]he proceedings of the [Board] are wholly administrative in nature, and that agency's determination of … [the] conditions of parole is not a judicial act." (*Id.* at p. 304.) Therefore, a prisoner has "no right to the appointment of counsel in proceedings of the [Board] to determine whether and under what conditions a prisoner should be granted parole," and no "such appointment [of counsel is] compelled by any constitutional mandate." (*Ibid.*)

Five years later, in *Minnis*, a prisoner challenged the validity of the parole procedures that were adopted by the Board's predecessor, alleging the procedures deprived him of "due process because he receive[d] 'no [legal] representation at the sentencing[.]' " (*Minnis, supra*, 7 Cal.3d at p. 650.) The Supreme Court again rejected the claim that due process entitles a prisoner to the assistance of legal counsel during parole proceedings. It reasoned that parole proceedings are "administrative in nature. [Citations.] Consequently, due process takes on a different significance in evaluating [the parole] agency's determination on … parole-granting than it had at trial." (*Ibid.*) Citing *Schoengarth*, the Court reaffirmed its prior holding that "counsel is not necessary to insure fairness" in parole proceedings. (*Minnis*, at p. 650.)

Under the doctrine of stare decisis, the California Supreme Court's holdings in *Schoengarth* and *Minnis* are binding on this court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Accordingly, we conclude prisoners do not have a procedural due process right to the assistance of legal counsel during parole proceedings.

*Prisoners Do Not Have a Due Process Right*
*to In-Person Parole Hearings or Multi-Member Parole Panels*

We turn now to the more difficult question of whether determinately-sentenced nonviolent prisoners have due process rights to in-person parole hearings and/or parole panels consisting of at least two or more panelists.

Under the first factor of the *Ramirez* test, we begin by identifying the private interest at stake in a parole release proceeding. " 'The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence.' " (*Samson v. California* (2006) 547 U.S. 843, 850, quoting *Morrissey v. Brewer* (1972) 408 U.S. 471, 477.) The parolee " 'is not free from legal restraint, but is constructively a prisoner in the legal custody of state prison authorities until officially discharged from parole.' " (*In re Taylor* (2015) 60 Cal.4th 1019, 1037.) Thus, a parole revocation decision "deprives an individual[] not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions." (*Morrissey*, at p. 480; see *Taylor*, at p. 1037.)

" 'An incarcerated individual for whom a parole date has not been set possesses less of an expectation of liberty than one for whom a release date previously has been established by the Board.' " (*In re J.G.* (2008) 159 Cal.App.4th 1056, 1064 (*J.G.*).) That is because parole revocation involves the loss of conditional freedom, whereas "parole release decisions concern an inmate's mere *anticipation* or *hope* of freedom." (*Sturm*, *supra*, 11 Cal.3d at p. 266, italics added.) Therefore, in a parole consideration proceeding, the private interest at stake is not a prisoner's interest in his or her conditional liberty; rather, it is the mere *expectancy* of his or her conditional liberty—a "limited liberty interest." (*J.G.*, at p. 1064; accord *Greenholtz v. Inmates of*

*Nebraska Penal and Correctional Complex* (1979) 442 U.S. 1, 10 (*Greenholtz*) [" 'It is not sophistic to attach greater importance to a person's justifiable reliance in maintaining his conditional freedom so long as he abides by the conditions of his release, than to his mere anticipation or hope of freedom.' "].)

Next, under the second *Ramirez* factor, we assess the parole regulations, the extent to which the parole regulations protect against the erroneous and arbitrary deprivation of a prisoner's expectancy of conditional freedom, and the probable value, if any, of additional procedural safeguards. In conducting this assessment, we remain mindful that "due process does not mandate that all governmental decision making comply with standards that assure perfect, error-free determinations." (*California Consumer Health Care Council, Inc. v. Department of Managed Health Care* (2008) 161 Cal.App.4th 684, 691; see *Mackey v. Montrym* (1979) 443 U.S. 1, 13 ["the Due Process Clause has never been construed to require that the procedures used to guard against an erroneous deprivation of a protectible 'property' ... interest be so comprehensive as to preclude any possibility of error"].)

The parole regulations provide that a prisoner who is deemed eligible for parole consideration and referred to the Board is entitled to receive notice of the referral. (Regs., tit. 15, § 3492, subd. (c).) The prisoner is "provided information about the nonviolent offender parole process, including the opportunity to submit a written statement to the Board" prior to the parole decision. (*Ibid.*) If the prisoner submits a statement to the Board, the parole criteria require the hearing officer to consider the prisoner's statement, in addition to all other relevant and available information pertaining to the prisoner. (*Id.*, §§ 2449.4, subd. (b); 2449.5, subd. (h) ["[A] [w]ritten statement[] submitted by the inmate … shall be considered."].)

Collectively, these procedural requirements ensure that a prisoner eligible for parole has a reasonable opportunity to inform the Board of any considerations weighing in favor of his or her parole suitability. For example, the prisoner can discuss any existing mitigating factors pertaining to his or her current conviction(s) or prior criminal behavior (Regs., tit. 15, § 2449.5, subds. (c), (e)), or attempt to explain away or blunt the impact of any aggravating factors (*id.*, subds. (b), (d), (f)). The prisoner can also highlight his or her rehabilitation in prison, including whether he or she has followed institutional rules, successfully participated in vocational, educational, or work assignments, or taken advantage of rehabilitative or self-help programming. (*Id.*, subd. (g).) By providing the prisoner notice and an opportunity to submit a written statement concerning parole suitability, the parole regulations reduce the risk that the Board will base its parole decisions on incomplete, incorrect, or otherwise flawed information.

Moreover, once the hearing officer has determined whether the prisoner is suitable for parole, the hearing officer must then issue a written parole decision, supported by a statement of reasons. (Regs., tit. 15, § 2449.4, subd. (d).) The requirement of a written parole decision reduces the likelihood a hearing officer will render an arbitrary and unsupported parole denial. It guarantees that a prisoner will be apprised of the reasons for his or her parole decision, thus allowing the prisoner to make a more informed choice as to whether to challenge the parole decision. (*Sturm*, *supra*, 11 Cal.3d at p. 267.) If a prisoner elects to challenge his or her parole denial, the written statement requirement facilitates the challenge by ensuring that a reviewing court has an adequate basis upon which to decide whether the parole decision is supported by "some evidence," as due process requires. (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 656; *Sturm*, at p. 270.)

The parole regulations afford additional process by allowing a prisoner to request review of an adverse parole decision. (Regs., tit. 15, §§ 2449.4, subd. (i); 2449.7, subd. (a).) A prisoner seeking review has an opportunity to articulate why he or she believes the initial parole decision was incorrect and provide additional information not available to the hearing officer when the initial parole decision was made. (*Id.*, subd. (a).) The review is conducted by a hearing officer who was not involved in the initial parole decision. (*Id.*, subds. (c)–(d).) Further, the parole regulations do not provide the prosecuting agency or the victims of the prisoner's crimes a means by which to seek review of a decision *granting* parole. Thus, it appears the review procedure advantages only the prisoner who is seeking parole release. This non-reciprocal review procedure further minimizes the risk of an arbitrary or capricious parole denial. (See *Stevens v. Workers' Comp. Appeals Bd.* (2015) 241 Cal.App.4th 1074, 1099 ["[A]s a result of the multiple layers of review, the risks of erroneous deprivations … appear to be fewer].)

The petitioners contend prisoners would benefit from an additional procedural safeguard—a requirement that each parole release decision be made by a panel of at least two hearing officers. However, it is not apparent to us—and the petitioners have not tried to explain to us—how additional panelists would reduce the likelihood of an arbitrary parole release decision. A parole release decision is, after all, "an attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts …." (*Sturm, supra,* 11 Cal.3d at p. 266; *In re Busch* (2016) 246 Cal.App.4th 953, 966 ["The decision whether to grant parole is an inherently subjective determination"].) Such an evaluation "is not so readily adapted to procedural due process safeguards as are decisions that turn on specific factual questions …." (*Ramirez, supra,* 25 Cal.3d at p. 273; *San Jose*

34

*Police Officers Association v. City of San Jose* (1988) 199 Cal.App.3d 1471, 1482–1483 [there are "problems with imposing additional procedural safeguards on inherently subjective, evaluative judgments"].)

We suppose it is conceivable the addition of a second (or third, fourth, or even fifth) hearing officer might aid some prisoners in some cases. For instance, additional hearing officers inclined to grant parole release to a given prisoner might carry the day whereas a single parole officer, left to his or her own devices, might otherwise have denied parole release. But it seems equally possible that the addition of more hearing officers to the equation would cause some prisoners to be *denied* parole release when they might otherwise have been granted parole release if the decision had been left to one hearing officer. In short, we have little reason to believe that more panelists necessarily mean more (and more sound) parole release decisions.

We also question whether additional hearing officers would substantially promote the accuracy of the information on which parole release decisions are made. The Supreme Court has opined that when multi-member panels conduct parole release proceedings for indeterminately-sentenced prisoners, it can be the case that only one panelist devotes his or her full attention to the prisoner's parole suitability while the second panelist "usually reads [the] file pertaining to the next inmate who will appear …." (*Sturm, supra*, 11 Cal.3d at p. 262.) According to the Court, the first "panel member states his proposed decision to the other panel member" and "[t]here is rarely any disagreement between the two …." (*Ibid.*) The Court's observation bolsters our conclusion that the purported advantages of multi-member parole panels are, at most, unclear.

The petitioners contend prisoners would also benefit from in-person parole hearings. We agree hearings "may be useful in resolving conflicting

35

information and in the introduction of subjective factors into the decision-making process that might otherwise not be considered; it thereby may often tend to enhance the accuracy and reliability of the exclusion decision." (*Ramirez*, *supra*, 25 Cal.3d at p. 275.)  The prisoner's body language may assist the parole decision-maker "in assessing signs of remorse and the effect of age," (*J.G.*, *supra*, 159 Cal.App.4th at p. 1059)—factors that may in turn impact the parole suitability decision.  (Regs., tit. 15, § 2449.5, subd. (a).) "And even in cases in which [in-person] participation [at a parole hearing] is unlikely to affect the outcome of the [parole] decision, it nevertheless promotes important dignitary values that underlie due process."  (*Ramirez*, at p. 275; see *Cramer v. Gillermina R.* (1981) 125 Cal.App.3d 380, 392–393.)

However, under the fourth *Ramirez* factor, these potential benefits cannot be considered in isolation without accounting for the weighty fiscal and administrative burdens that in-person parole hearings would impose on the government.  The appellate record contains a declaration from the Board's Executive Officer in which she averred there were approximately 4,000 nonviolent, determinately-sentenced inmates who were eligible for early parole consideration.  She further averred there were about 2,700 more inmates who would become eligible for early parole consideration within one year.  This evidence suggests the Board conducts early parole consideration reviews—and would be required to conduct in-person parole hearings if we

36

were to adopt the petitioners' argument—for *thousands* of determinately-sentenced inmates each year.[17]

These in-person parole hearings would be exceptionally costly for the government. Based on the costs associated with in-person parole hearings for indeterminately-sentenced prisoners, the People estimate it would cost the Board tens of millions of dollars annually to conduct in-person parole hearings for all eligible determinately-sentenced nonviolent prisoners.[18] Furthermore, we can reasonably infer in-person parole hearings would consume substantially more time than a documentary review of a prisoner's parole suitability—both to prepare for the in-person hearing and to conduct the in-person hearing. Therefore, it is apparent in-person parole hearings for determinately-sentenced nonviolent felons would place painful fiscal and administrative strain on the government.

Finally, with respect to the *Ramirez* factor concerning dignitary interests, we note that the parole regulations permit prisoners to make their case for parole release in ways other than in-person parole hearings. As noted, they allow prisoners to file a written statement before an initial parole decision and, if necessary, in a second written statement explaining why the initial parole decision is incorrect. (Regs., tit. 15, §§ 2449.7, subd. (a); 3492,

_____

[17] We grant the People's request for judicial notice of administrative notices and statements pertaining to the adoption of parole regulations. (Evid. Code, § 452, subd. (c).) One of those statements indicates that nearly 30,000 inmates were screened for early parole consideration after voters passed Proposition 57. (See Cal. Dept. of Corrections, Credit Earning and Parole Consideration Final Statement of Reasons, April 30, 2018, pp. 481, 552.)

[18] The People note the Governor allocated $8.2 million in his proposed annual budget for the implementation of the early parole consideration process for indeterminately-sentenced felons.

subd. (c).) Prisoners receive these opportunities annually, assuming they remain incarcerated and eligible for parole consideration. (*Id.*, §§ 2449.4, subd. (h); 3492, subd. (b).) These opportunities promote the dignitary values of the persons seeking parole release. (See *Rodriguez v. Department of Real Estate* (1996) 51 Cal.App.4th 1289, 1298–1299 [broker's dignitary interest satisfied because broker could oppose suspension of his or her license with written statement].)

Balancing all these factors, we conclude the parole regulations do not violate the procedural due process rights of prisoners. We acknowledge in-person parole hearings might increase the accuracy of some parole release decisions and promote the dignity interests of prisoners. However, in our view, those potential benefits simply do not prevail over all the other factors weighing against a new constitutionally-based right to annual, in-person parole hearings. We are particularly cognizant of the fact that prisoners have limited liberty interests in parole release proceedings, as well as the obvious and considerable fiscal and administrative burdens flowing from in-person parole hearings. And while the parole regulations may not assure error-free parole decisions in all cases, they contain numerous features that reduce the risk of arbitrary parole decisions. Many of those same features promote prisoners' dignitary interests. Considering all these factors, we conclude the parole regulations afford prisoners reasonable notice and a reasonable

opportunity to be heard.  That is all due process requires.[19]  (*Jonathan Neil & Associates v. Jones* (2004) 33 Cal.4th 917, 936, fn. 7.)

4

*The Parole Criteria Regulation Does Not Offend Due Process*

In their appellate brief, the petitioners claim the regulation setting forth the criteria for parole suitability determinations (Regs. tit. 15, § 2449.5) is void-for-vagueness.  The petitioners assert the regulation is impermissibly vague because it does not identify the specific amount or type of rehabilitative programming in which a prisoner must engage to ensure that he or she will be found suitable for parole.

---

[19]    Lower federal court decisions construing the due process clause of the federal Constitution do not bind us in our interpretation of the due process clause of the California Constitution.  (*Qualified Patients Association v. City of Anaheim* (2010) 187 Cal.App.4th 734, 764.)  However, we note—and find persuasive—that numerous lower federal courts have found the parole regulations do not violate prisoners' procedural due process rights under the federal Constitution.  (*Young v. Lozano* (E.D. Cal. Oct. 26, 2020, No. 2:20-cv-0350 TLN KJN P) 2020 U.S. Dist. Lexis 198856, at *8–9 ["There is no federal requirement that petitioner be physically present at the Proposition 57 parole consideration hearing … [or] that his suitability hearing be conducted with a minimum of two commissioners …."]; *Garcia v. Callahan* (C.D. Cal. Jan. 8, 2020, No. CV 19-00661-VAP (DFM)) 2020 U.S. Dist. Lexis 28564, at *4 ["Although Petitioner did not receive an in-person hearing, such a hearing is not required."]; see also, e.g., *Cleveland v. Warden* (C.D. Cal. Dec. 20, 2019, No. 2:19-cv-09730-DSF (GJS)) 2019 U.S. Dist. Lexis 219185, at *10–11; *Hewitt v. Board of Parole Hearings* (E.D. Cal. Oct. 25, 2019, No.: 1:19-cv-00501-SAB (PC)) 2019 U.S. Dist. Lexis 185482, at *6–7; *Stephens v. Kunz* (C.D. Cal. Sept. 18, 2019, No. CV 19-1008-AB (KS)) 2019 U.S. Dist. Lexis 212017, at *10.)  Further, we note that there is federal appellate authority standing for the proposition that in-person parole hearings are not guaranteed by the federal due process clause.  (*Franklin v. Shields* (4th Cir. 1977) 569 F.2d 784, 800 [en banc] ["[W]e discern no constitutional requirement that each prisoner receive a personal [parole] hearing …."].)

39

Moreno and Smith did not challenge the parole criteria regulation on vagueness grounds in their petitions for writs of habeas corpus and none of the trial courts granted habeas relief based on the alleged vagueness of the parole criteria regulation. Therefore, we have doubts the petitioners' void-for-vagueness challenge is properly before us. However, assuming the general due process violations alleged in the petitioners' habeas corpus petitions adequately encompassed the void-for-vagueness challenges they now raise,[20] and further assuming those challenges are ripe for our review, we conclude the parole criteria regulation is sufficiently definite to survive the petitioners' vagueness challenge.

"The due process clauses of the federal and state Constitutions require a reasonable degree of certainty in legislation [and regulation]." (*Menefield v. Board of Parole Hearings* (2017) 13 Cal.App.5th 387, 396.) However, regulations governing parole release decisions do not proscribe criminal behavior; instead, they guide the exercise of administrative decision-making. (*Hess v. Board of Parole & Post-Prison Supervision* (9th Cir. 2008) 514 F.3d 909, 914.) Therefore, due process "does not require the same precision in the drafting of parole release [regulations] as is required in the drafting of penal laws." (*Ibid.*; accord *Hoffman Estates v. Flipside, Hoffman Estates, Inc.* (1982) 455 U.S. 489, 498 ["The degree of vagueness that the Constitution tolerates … depends in part on the nature of the enactment.].)

Title 15, Division 2, Chapter 3, Article 15, section 2449.5 sets forth the factors a hearing officer is required to consider when determining whether a nonviolent determinately-sentenced prisoner is suitable for early parole. The hearing officer must consider aggravating and mitigating factors relating to

[20] "The void-for-vagueness doctrine is a component of the constitutional requirement of due process of law." (*Ivory Education Institute v. Department of Fish & Wildlife* (2018) 28 Cal.App.5th 975, 982.)

the prisoner's current conviction(s), prior criminal conviction(s) and criminal behavior, and the institutional behavior, work history, and rehabilitative programming, in addition to any statements the prisoner, the prosecuting agency, and/or the crime victim(s) submitted.  (Regs., tit. 15, § 2449.5.)

The portion of the regulation concerning the prisoner's institutional behavior, work history, and rehabilitative programming states in pertinent part that the hearing officer can consider, as a mitigating factor weighing in favor of parole, whether the prisoner "has successfully participated in vocational, educational, or work assignments for a sustained period of time," or "successfully participated in rehabilitative or self-help programming to address the circumstances that contributed to his or her criminal behavior, such as substance abuse, domestic violence, or gang involvement, if any, for a sustained period of time."  (Regs., tit. 15, § 2449.5, subd. (g)(2)–(3).)  This portion of the regulation affords reasonable and sufficient notice to prisoners of the nature and type of rehabilitative behavior that will constitute a mitigating factor during a parole release decision.  Therefore, it is sufficiently definite to survive the petitioners' void-for-vagueness challenge.

To the extent the petitioners contend that due process demands greater specificity to inform prisoners whether they will receive parole or the weight that will be placed on each parole factor, the petitioners are mistaken.  As noted, a parole release decision is subjective and predictive.  (*Rosenkrantz*, *supra*, 29 Cal.4th at pp. 654-655.)  "[T]here is no set of facts which, if shown, mandate a decision favorable to the individual."  (*Greenholtz*, *supra*, 442 U.S. at p. 10.)  A parole release decision "may be made 'for a variety of reasons and often involve[s] no more than informed predictions as to what would best serve [correctional purposes] or the safety and welfare of the inmate.' "  (*Ibid.*)  "[T]he precise manner in which the specified factors relevant to parole

41

suitability are considered and balanced lies within the discretion of the [parole authority] ...." (*Rosenkrantz*, at p. 677; see *In re Lawrence* (2008) 44 Cal.4th 1181, 1212 ["It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public."].)  The parole criteria regulation specifies the factors that the Board, in its discretion, may weigh and balance during each individual prisoner's parole consideration proceeding.  Therefore, the parole criteria regulation is not unconstitutionally vague.

IV

DISPOSITION

The orders granting the petitions for writs of habeas corpus are reversed.

McCONNELL, P. J.

WE CONCUR:

BENKE, J.

O'ROURKE, J.